

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**JOHN DOE**                                                                               **PLAINTIFF**

**V.**                                             CIVIL ACTION NO.: _3:18cv63 DPJ-FKB_

**THE UNIVERSITY OF MISSISSIPPI;**
**STATE INSTITUTIONS OF HIGHER**
**LEARNING ("IHL"); TRACY MURRY,**
**INDIVIDUALLY AND IN HIS OFFICIAL**
**CAPACITY; HONEY USSERY,**
**INDIVIDUALLY AND IN HER**
**OFFICIAL CAPACITY; STATE OF**
**MISSISSIPPI, and DOES 1 - 5**                                          **DEFENDANTS**

## COMPLAINT

### JURY TRIAL DEMANDED

Plaintiff John Doe[1] ("Doe"), files this Complaint seeking declaratory, injunctive and

monetary relief against Defendants the University of Mississippi ("the University"), State

Institutions of Higher Learning ("IHL"), the State of Mississippi ("State"), Tracy Murry

("Murry"), and Honey Ussery ("Ussery"), for gender-based discrimination in violation of Title IX

of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.* ("Title IX"), violations of the

due process clause of the Fourteenth Amendment to the U.S. Constitution brought pursuant to 42

U.S.C. § 1983 and for breach of contract. In support of this Complaint, Doe alleges as follows:

1.      As a result of the false allegations of sexual misconduct that were made against

John Doe and the actions taken by the Defendants both individually and collectively, Doe has been

unable to continue his education at the University and a finding of sexual assault has been listed

in his educational records.  Doe has sustained and continues to sustain damages to his education

---

[1] Plaintiff files herewith a motion to proceed pseudonymously.

and his career opportunities as a result of the University's denial of due process and erroneous finding that he was responsible for an offense he did not commit, and the related issuance of excessive discipline in the form of expulsion from the University.

2.    The authority and jurisdiction of the University's Conduct System is established pursuant to the delegation of legal authority by the Chancellor and the Board of Trustees of State Institutions of Higher Learning.  In Article IX, § (5) of the bylaws and policies of the Board of Trustees of State Institutions of Higher Learning, the Chancellor of the University of Mississippi is charged with the responsibility of maintaining appropriate standards of conduct for students and is authorized to expel, dismiss, suspend, and/or place limitations on continued attendance and/or levy penalties for disciplinary violations subject to procedures of due process.

3.    The policies and procedures enacted by the University, pursuant to the delegation of authority granted by the Chancellor and the Board of Trustees of State Institutions of Higher Learning, and as applied in practice and custom, favor females over males in sexual assault disputes and denied John Doe his due process rights in violation of the Fourteenth Amendment to the U.S. Constitution.

4.    Throughout the investigative and appeal process, the Defendants failed to abide by the University's guidelines and regulations and acted in direct violation of federal and state law. Furthermore, the University, Murry and Ussery failed to conduct a thorough and impartial investigation of the allegations brought against John Doe, failed to conduct and ensure a timely adjudication process and made credibility and evidentiary assessments with respect to the parties and witnesses that were not based upon substantive evidence.

5.    The University, Defendant Murry and Defendant Ussery knew or should have discovered during the course of an unbiased investigation, that Jane Roe ("Roe") solicited and

2

instigated sexual activity with John Doe, consensually participated in sexual activity with Doe and only made allegations against Doe in retaliation for reasons which include *inter alia* not being invited to his fraternity formal.

6.      The University, Defendant Murry and Defendant Ussery failed to obtain and/or consider relevant exculpatory evidence during the course of the investigation and exhibited a gender bias towards John Doe. In addition, the Defendants failed to provide a rationale for the ultimate decision to expel Doe and failed to afford Doe the presumption of innocence required as a matter of law.

7.      The determination issued by the Defendants against John Doe did not take into consideration the substantial weight of the evidence available.  The actions of the Defendants exhibited a gender bias against males and an underlying motive to protect the University's reputation and financial status.

8.      The wrongful actions taken by the Defendants resulted in a denial of John Doe's Fourteenth Amendment substantive and due process rights and were in violation of Title IX.  In addition, the University's actions were in breach of its contract with Doe.

9.      John Doe has been significantly damaged by the Defendants, individually and collectively.  As a result of the unconstitutional and biased actions and omissions of the Defendants, Doe was expelled resulting in damage to his educational and career prospects, psychological, emotional and reputational damages, and economic injury.

10.      John Doe brings this action to obtain relief for a violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et. seq.*, violations of the substantive and procedural due process clauses of the Fourteenth Amendment to the U.S. Constitution brought pursuant to the procedural vehicle of 42 U.S.C. § 1983, and for breach of the University's contract

with him. Doe seeks declaratory, injunctive and monetary relief to remedy emotional, mental, and economic harms he has suffered.

## PARTIES

11.     Plaintiff John Doe is a natural person and is a resident of Georgia. During the events at issue herein he was an undergraduate student at the University of Mississippi and resided in Oxford, Mississippi.

12.     Jane Roe is a non-party undergraduate student at the University of Mississippi and the Complainant in the underlying Title IX disciplinary proceeding against John Doe.

13.     John Doe seeks to use pseudonyms "John Doe" and "Jane Roe" in this Complaint in order to preserve his privacy and the privacy of the student who raised the allegations against him, as the subject of this Complaint relates to intimate and personal matters. A separate motion in support of this request has been filed with the Court.

14.     The public's interest in knowing the identities of John Doe and Jane Roe is outweighed by privacy concerns. In addition, use of pseudonyms will not prejudice the Defendants because they know the identities of both John Doe and Jane Roe. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 36 L.Ed.2d 201 (1973). Furthermore, the disclosure of Doe's identity will cause him irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232(g); 34 CFR Part 99.

15.     Defendant University of Mississippi is a public university created by the Mississippi legislature. The University of Mississippi's main campus is situated in Oxford,

Mississippi, and multiple additional campuses are situated throughout Mississippi, including in Jackson, Mississippi.

16.     Defendant State Institutions of Higher Learning ("IHL") is the constitutional governing body responsible for policy and financial oversight of public institutions of higher learning in Mississippi. IHL is the body responsible for conferring degrees upon students of state institutions. IHL is situated at 3825 Ridgewood Road, Jackson, Mississippi. As an element of contract, The Board of Trustees of the IHL confers the degrees and diplomas upon students graduating from the University. But for the actions complained of, John Doe had a reasonable expectation of receiving such a degree and diploma from the University by and through the IHL. The Defendant State of Mississippi is responsible for the actions of the remaining Defendants as they are its agencies, subdivisions, agents and/or employees; such acts represent the actions of the State itself as a matter of law.

17.     Defendant Tracy Murry is the Director of Conflict Resolution and Student Conduct at the University of Mississippi. His office with the University is located at 100 Somerville Hall, University, Mississippi. Upon information and belief, Murry is a resident of the State of Mississippi and resides at 2000 Lexington Pt., Apt 12A, Oxford, Mississippi 38655. Murry is sued in his official capacity for those actions taken in conjunction with the regulations set forth by the Institutions of Higher Learning and the University of Mississippi and the State, as well as the policies and procedures of the University of Mississippi. In addition, Murry is sued in his individual capacity with respect to the actions and inactions he personally took against John Doe that were reckless, malicious and/or deliberately indifferent to the rights of Doe.

18.     Defendant Honey Ussery, is the Title IX Coordinator for the University of Mississippi. Her office with the University is located in the Martindale Student Services Center

in University, Mississippi. Upon information and belief, Ussery is a resident of the State of Mississippi and resides at 415 Timber Lane Oxford, Mississippi 38655. Ussery is sued in her official capacity for those actions which were taken in conjunction with the practices, policies and procedures of the University of Mississippi. In addition, Ussery is sued in her individual capacity with respect to the actions and inactions she personally took against John Doe that were reckless, malicious and/or deliberately indifferent to the rights of Doe.

19.     Does 1-5 are persons and entities who are responsible for the improper actions against John Doe, including but not limited to the Title IX disciplinary investigation and sanction of expulsion, or who are later identified as necessary parties.

## JURISDICTION AND VENUE

20.     This case arises in part under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq*., and the Fourteenth Amendment to the United States Constitution, brought pursuant to the procedural vehicle of 42 U.S.C. §1983 and accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Furthermore, the Plaintiff and Defendants have complete diversity and this Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332. This Court has supplemented jurisdiction over Plaintiff's state law contract claim pursuant to 28 U.S.C. § 1367.

21.     The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

22.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. Defendant IHL is situated in this district and the Defendant the University has a campus situated in this district. Further, certain of the predicate acts giving rise to the claims herein occurred in part within this district.

6

## STATEMENT OF FACTS

### The Relationship Between John Doe and Jane Roe

23.     While attending the University in 2016, students John Doe and Jane Roe were introduced through a mutual friend.  The two became friends and had a consensual, intimate relationship.

24.     The first time John Doe and Jane Roe had consensual sex was in early 2017, at Doe's fraternity house.   Roe had approached Doe and asked him to follow her.  Roe led Doe to an upstairs room at the fraternity house, where the two talked and flirted.  After Roe repeatedly informed Doe that she wanted to have sex, the two engaged in mutually consensual sexual activity.

25.     John Doe and Jane Roe continued to see each other socially after having sexual relations.   Roe accompanied Doe to his fraternity's parents' weekend activities, where Roe met Doe's mother and stepfather and spent time with his family.

26.     John Doe subsequently invited Jane Roe to his fraternity formal scheduled to occur in New Orleans the weekend of March 31 – April 2, 2017.   Twice, Roe told Doe she would go to formal with him, then recanted due to personal reasons.  Doe invited someone else to the event and advised Roe of this.  The two remained friends.

27.     In late March, 2017, one of John Doe's fraternity brothers invited a female friend of Jane Roe's to the formal in New Orleans.

28.     The week before the formal Jane Roe and her friend discussed trying to go to the formal in New Orleans together.  In doing so, they decided to convince John Doe to cancel the plans with his new date and take Roe to the formal instead.  This would allow Roe and her friend to attend the event together.

29.     On March 30, 2017, Jane Roe contacted John Doe again about going to his formal the following day. Roe sent Doe a text message stating, "I'll suck your dick, if you ditch [another woman] and take me instead."

30.     At approximately 7:15 p.m. on the evening of March 30, 2017, Jane Roe and two of her girlfriends went to John Doe's dormitory to visit.

31.     Between 7:15 p.m. and 8:00 p.m. Jane Roe's friends briefly left John Doe's room. Roe remained in the room. While Roe and Doe were alone in the room, Roe seductively touched her breasts and showed Doe how her new bra worked. Roe explained to Doe that she could adjust the bra to create more cleavage or the "push up" effect.

32.     Jane Roe's friends returned to John Doe's room around 8:00 p.m. The group remained in Doe's room for a couple of hours and was joined by another male student.

33.     At approximately 10:30 pm. John Doe got up to leave. While gathering his belongings, he announced that he was leaving his room to meet his date for formal. Everyone left except for Jane Roe, who remained on the futon.

34.     John Doe remained with Jane Roe an the two talked on the futon. While talking with Doe, Roe was text messaging her girlfriend who had left the room earlier. The text conversation was about Roe "hooking up" with Doe. When Roe's telephone was open, Doe saw a text message that said, "you should hook up with him."

35.     Jane Roe and John Doe began kissing. Their interaction progressed to mutual and consensual caressing and foreplay. Doe eventually got up and went to get a condom. When he did so, Roe waited on the futon. After Doe had obtained a condom, the two-continued making out, then decided to have sex.

36.     John Doe and Jane Roe engaged in mutually consensual sex, during which time Roe provided verbal and physical indications of her enjoyment and the continuing nature of her consent.

37.     At approximately midnight, a dormitory administrator knocked on the door and informed John Doe and Jane Roe that visiting hours were over. The dormitory administrator waited outside the room until Doe and Roe came out. The dormitory assistant then escorted both Doe and Roe to the lobby so that Roe could be signed out of the building for the evening.

38.     At no time did Jane Roe tell the dormitory administrator or security personnel who was seated in the lobby that she had been assaulted, nor did she request any assistance from either of them. Rather, before leaving the dormitory, Roe hugged John Doe goodnight. As she was leaving, Roe told Doe to have a good time at his formal.

39.     John Doe did not cancel his pre-existing date for the formal, as Jane Roe had wanted. Rather, the following day, Doe attended the event with another woman.

40.     On March 31, 2017, Jane Roe reported being sexually assaulted by John Doe. Roe made this false allegation to a representative with the Title IX office, who notified the University Police.

41.     It was not until after John Doe returned from his formal, that Jane Roe first raised any issue with him about their sexual activity that occurred on March 30, 2017.

42.     When interviewed by the University Police, Jane Roe advised that she did not initially believe she was raped but her friends told her that she was. Roe asked the officer to delay contacting John Doe about her allegations until after a sorority party on April 5, 2017, because she thought she might see Doe at the party that evening.

9

43.     In the days and weeks immediately following the incident, Jane Roe attended fraternity parties at John Doe's fraternity house, where she knew he lived or would be in attendance.  In addition, Roe met with and spoke to Doe.

44.     On April 18, 2017, Jane Roe indicated she did not want to pursue charges against John Doe.  Again, on April 20, 2017, Roe confirmed with the University police that she did not want to pursue charges against Doe.  Roe told University Police that she felt she had received the closure she needed to go about her routine and she was happy with it.  Subsequently, Roe met an officer at the University Police Department and completed a non-prosecution form.

45.     In late May 2017, Jane Roe pursued a Title IX Complaint against John Doe.  Upon information and belief, Roe did so at the instance of others, including Defendant Ussery.


**Title IX Complaint and the University Investigation**

46.     In June 2017, Defendant Ussery interviewed the woman who attended the formal with John Doe.  The woman was instructed not to let Doe know she had been contacted by Ussery or that they had spoken.

47.     John Doe was not interviewed by Defendant Ussery until one month later, on July 11, 2017.

48.     In his interview with Defendant Ussery, John Doe advised that he and Jane Roe had a pre-existing sexual relationship.  He reported that he had never used force with Roe and that their sexual relations had always been mutually consensual.  Doe told Ussery that the first time the two had sex, Roe had approached him at his fraternity house and initiated and solicited the sexual interaction.  He also reported the explicit text message he had received from Roe on the date of the alleged assault and reported the fact that Roe voluntarily went to his room that evening.

Furthermore, Doe told Ussery of Roe's assertive and affirmatively suggestive actions towards him when her friends had left the room, including how Roe seductively touched her breasts, continued to lay on his futon when he said he was planning on leaving and how she later climbed on top of him. Doe reported the conversations he and Roe had about whether or not to have sex, and the fact that Roe had both lowered Doe's pants and pulled her own underwear to the side in order for them to engage in intercourse. Doe also specifically informed Ussery of the repeated positive comments and movements of Roe during the brief course of their sexual activity, which was indicative of her continued consent.

49.     When John Doe was interviewed about the events of March 30, 2017, he specifically advised Defendant Ussery that he and Jane Roe only engaged in actual intercourse for a few minutes. Doe explained that around midnight, the dormitory assistant knocked on the door to advise of curfew.

50.     Based on John Doe's report to Defendant Ussery, Ussery knew or should have known that the University's security videotape would show the identity of persons entering and exiting John Doe's dormitory, the times of their entry and exit, and the dispositions of persons as they entered and departed. However, Ussery did not attempt to obtain the videotape or review it as part of her investigation.

51.     Despite requests, John Doe was never allowed to see the security video, nor was he provided a copy when requested. Upon information and belief, the video was never shown to the University Judicial Council.

52.     Similarly, despite being told that Jane Roe had offered to perform oral sex on John Doe on March 30, 2017, Ussery did not request any copies of the text messages from Roe.

53.     The report submitted by Ussery to the University Judicial Council did not apprise the Council of certain factual matters which were exculpatory.  In addition, the report left out details and information that would have been critical for an unbiased decision.

54.     Some of the misrepresentations and exculpatory matters in Ussery's report included:

a.      The report submitted by Ussery did not advise of Jane Roe's statement that she initially did not believe she was raped but her friends told her to report the situation;

b.      Ussery's report indicated that Jane Roe told John Doe his touches felt good, however, Doe had reported this was said by Roe not just once, but on multiple occasions;

c.      Ussery's report erroneously stated that John Doe reported Jane Roe "adjusted his pants."  However, Doe reported that Roe pulled down his pants, again evidencing her intent to proceed with consensual relations;

d.      Critically, Ussery's report failed to accurately reflect John Doe's statement that Jane Roe had affirmatively stated that she wanted to have sex on the evening of March 30, 2017;

e.      The report submitted by Defendant Ussery did not reference the fact that Jane Roe had asked an officer to delay contacting John Doe about her allegations until after a sorority party because she thought that she would see John Doe at that party;

f.     The report submitted by Defendant Ussery did not mention the fact that Jane Roe indicated on multiple occasions that she did not want to pursue charges against John Doe and that she executed a non-prosecution form;

g.     The report submitted by Defendant Ussery did not address the fact that Jane Roe had told University Police in April, 2017, she felt that she had received the closure she needed;

h.     Defendant Ussery did not address the forensic police evidence obtained and maintained by the University of Mississippi police department in her report, including the physical evidence procured from Jane Roe;

i.     Defendant Ussery did not interview the dormitory administrator who knocked on John Doe's room and escorted Doe and Roe downstairs on the evening of March 30, 2017;

j.     Defendant Ussery did not interview the security personnel who was in the lobby of John Doe's dormitory on the evening of March 30, 2017, nor address his presence in her report;

k.     Upon information and belief, Defendant Ussery inaccurately paraphrased and summarized certain witness statements.

55.    In addition to Defendant Ussery's failure to evaluate and apprise the University Judicial Council of exculpatory evidence, there were numerous inconsistencies in the statements of Jane Roe which the University Judicial Council had been trained by Ussery and the University to disregard.

56.    The hearing conducted by the University Judicial Council related to the allegations against John Doe that occurred on August 24, 2017.  At the initial hearing, Doe was denied basic

13

procedural due process. Doe was not allowed to subpoena witnesses or cross-examine his accuser or other witnesses. In addition, hearsay was permissible.

57.    At the conclusion of August 24, 2017, hearing, John Doe was advised that he was being expelled by the University. Doe was not given an explanation for the University's findings nor any explanation for the severe sanction, despite his requests.

58.    Due to bias and procedural and substantive deficiencies associated with the initial hearing, John Doe filed an appeal with the University on August 31, 2017. On appeal Doe raised multiple significant errors regarding the proceeding, including but not limited to the bias of Defendant Ussery and the exclusion of exculpatory evidence.

59.    Throughout the appeal process John Doe consistently requested the opportunity to remain on campus in order to continue his education.

60.    On Friday, September 8, 2017, Defendant Murry emailed John Doe requesting to meet with him regarding re-attending class while the case was on appeal. The two met on Monday, September 11, 2017, and Murry informed Doe he would allow Doe to re-attend classes. Murry advised Doe to contact his professors and develop a plan to make up the missed school work. In turn, Murry would contact the professors and explain why Doe had been absent from class. Doe contacted his professors asking them to meet with him about his coursework and copied Murry on the emails.

61.    One hour before John Doe's meeting with a professor, Defendant Murry told Doe he could not attend class. Doe was forced to email his professors and cancel his meetings without being able to provide an explanation. Upon information and belief, Murry never communicated with any of Doe's professors despite his representations.

62.     On Friday, September 22, 2017, Defendant Murry informed John Doe that the Appellate Consideration Board had reached a decision on his appeal and advised Doe that he would receive a decision letter the following Monday, September 25, 2017. That did not occur.

63.     On Tuesday September, 26, 2017, Defendant Murry again advised John Doe that the Appellate Consideration Board had reached a decision, but Murry claimed the Board had not provided him with a rationale for their decision. Murry subsequently claimed he needed additional time to review their opinion and be sure he understood it before he could share the decision with Doe.

64.     On September 28, 2017, John Doe was first told of the favorable Appellate Board determination. However, he received no explanation or confirmation in writing.

65.     On September 29, 2017, John Doe was given a verbal explanation of the Appellate Consideration Board's determination but was still not permitted to attend class.

66.     On October 11, 2017, John Doe was finally provided with a letter regarding the Appellate Consideration Board's determination. The letter provided to Doe on October 11, 2017, indicated that the Appellate Consideration Board had found that when the Title IX Coordinator was asked to provide a "case summary" during the August 24, 2017, hearing, she did not share Doe's account of the incident or any discrepancies reported in the various accounts of what happened. In addition, the determination letter indicated that the Appellate Consideration Board found the Title IX Coordinator had provided a partial or one-sided account of the investigation. The Appellate Consideration Board indicated that it could not determine whether or not potentially exculpatory evidence was considered by the Judicial Council due to the lack of follow up questioning regarding noted strong discrepancies and ordered a new hearing. The Appellate

Consideration Board had granted his appeal of the August 24, 2017, decision and remanded the case for reconsideration.

67.     During the last two weeks of October, 2017, after midterms, John Doe was permitted to return to classes. However, Doe's professors believed it would be difficult and almost impossible for him to makeup the work so late in the term.  As such, Doe had to take a limited load for audit purposes only.

68.     In preparation for the new hearing John Doe requested exculpatory evidence that had been kept from him.  He also obtained additional information which was submitted to the University and to Defendant Ussery for consideration.

69.     On October 16, 2017, Defendant Ussery contacted John Doe and informed him that certain evidence he sought to have considered seemed to be based on information from the last hearing and because there would be a new panel, information from the first hearing was not admissible.  Ussery further advised that the polygraph results were not admissible, and photos and video may be irrelevant.  Ussery then informed Doe that her office had already completed its investigation and would not obtain other information.  Tracy Murry was aware of this statement and did not intercede.

70.     Defendant Ussery refused to consider the additional exculpatory evidence that John Doe submitted to her.   While not considered or addressed in the University's investigation, the supplemental items were provided to the panel in a separate folder, at Doe's insistence.

71.     While certain supplemental items were provided to the panel at the insistence of John Doe, they were put in a separate folder and Defendant Ussery refused to consider them in her report.  In fact, Ussery submitted the exact same report to the University she had submitted at the first hearing which had been found to be biased and lack discussion of exculpatory evidence.

72.     The distinction between the materials Defendant Ussery addressed in her report and included in her file, and those submitted by John Doe and separately maintained, clearly showed which items Ussery felt belonged with the case file contrasted with those which she considered irrelevant.

73.     A Forensic Medical Report/ Sexual Assault Examination of Jane Roe that was conducted on March 31, 2017 revealed (a) no findings of any injury to her vagina or neck and (b) no physical injury to Roe. This report was provided to the University but went unaddressed in Defendant Ussery's report. It had to be presented to the University Hearing Council separately from the original case file.

74.     In addition, Defendant Ussery would not consider the expert report of Dr. Kris Sperry or a polygraph examination and associated report presented by John Doe.   These matters also had to be presented to the University Hearing Council separately from the original case file.

75.     The University Judicial Council scheduled a hearing to consider the report brought against John Doe for November 15, 2017.  At approximately 4:00 p.m. on the afternoon of November 14, 2017, Doe and his advisors were first made aware of a change to the panel, through a verbal notification. By the close of business on November 14, 2017, the final panel had not been selected and Doe had not been provided the identity of the person serving as the Chair.

76.     After the close of business on November 14, 2017, the November 15, 2017, hearing was cancelled. Two of John Doe's witnesses – Dr. Kris Sperry and Patrick Coffey – were notified of the fact and cancelled their flights to Mississippi.

77.     On November 15, 2017, the hearing was reset for November 16, 2017.  The University's General Counsel and the Council advised John Doe that it had to move forward with

the hearing, despite the fact Doe's witnesses could not get flights back to Mississippi on such a short turn around.

78.     At 4:08 p.m. on November 15, 2017, Robert Jolly, Assistant General Counsel, emailed John Doe to advise of the identity of the Chair and faculty representative for the next day's hearing and to provide multiple names of people who might serve as the student representative. Doe was required to raise any objection to the University by 9:00 a.m. the next morning.

79.     At 11:07 a.m. on November 16, 2017, Defendant Murry contacted John Doe to advise that that a panel member was now unavailable, and an alternate would need to be selected. The alternate was trained that day so that she could sit on the panel later that same afternoon.

80.     The November 16, 2017, hearing began at approximately 4:00 p.m. Due to scheduling issues and the impossibility of witnesses to fly to Mississippi with less than 24-hours' notice, two of John Doe's witnesses had to participate in the hearing via Skype. During the course of the hearing, the University's internet service went down, and the power went out.  At times, the witnesses who were participating via Skype could not be fully seen.

81.     While Defendant Ussery did not testify at the second hearing, her unaltered first summary report was re-submitted to the Judicial Council for consideration.  Information that John Doe had attempted to bring to Ussery's attention was not addressed in the report. Rather, it was put in a separate folder.

82.     In Jane Roe's opening statement, she informed the seated Judicial Council that John Doe had already been found "Responsible" for sexual assault in the prior Title IX hearing which had been overturned on appeal and that he had been expelled by the University.

83.     John Doe immediately objected to the highly prejudicial and misleading statement by Jane Roe and requested that a mistrial be declared and the hearing concluded and the panel

dismissed.   The Judicial Chair indicated that he would confer with Defendant Murry on the objection in order to determine how to move forward. Murry indicated that he would consult with the General Counsel of the University because the University did not have a written policy or procedure for addressing prejudicial error occurring in the course of a Council proceeding.

84.   After the Judicial Council conferred with Defendant Murry and Murry conferred with the Office of the General Counsel, the decision was made to disregard the objections and motion of John Doe and to continue the hearing.  No disciplinary action was initiated against Roe, despite her conduct.

85.   Despite the tainting of the panel and without further explanation of the bias and error that occurred in the earlier proceeding, an affirmative decision was made that the hearing should proceed.  Jane Roe's grossly improper comments were not merely overlooked by the University, but affirmatively sanctioned and ratified by Defendant Murry and the University.

86.   The failure of the University to have a policy in place to protect an accused from highly misleading and prejudicial representations and the fact that the University took no action to remedy the situation when it occurred, evinced a continued bias against John Doe.

87.   At the hearing, Jane Roe was specifically asked whether or not she had conspired with her friend to get John Doe to take her to formal.  Roe responded, "Yeah, I guess, yeah the day before."  Roe continued to state, "[Female friend] got asked that day and [female friend] didn't want to go alone so that's why I texted [John Doe].  It was all that day."

88.   Despite the fact that Defendant Ussery had been advised of the existence and exculpatory relevance of Jane Roe's explicit text message to John Doe offering oral sex in exchange for an invite to his formal, Jane Roe testified that Ussery did not request copies of the text messages from her during the course of the investigation.

89.    Throughout the investigation and disciplinary hearings, the information given by Jane Roe to Defendant Ussery, the panel, and others was repeatedly contradictory. Inconsistencies existed with the timing and sequence of events as they were communicated by Jane Roe.  In addition, Roe provided contradictory statements to medical personnel and at the hearing.

90.    While documentation submitted to the crime lab from the University nursing personnel indicated that Jane Roe told nursing personnel John Doe climbed on top of her and put his hand on her upper chest and neck, then later threw her on the bed, Roe denied ever reporting this. At the hearing, Jane Roe testified that she never said John Doe pushed her down or held her by the neck.

91.    Patrick E. Coffey, ("Coffey"), a Clinical Polygraphist with Metro Atlanta Polygraph, LLC, administered a polygraph examination to John Doe on August 17, 2017, which was entered into the record at the University proceedings.  At the hearing, Coffey testified regarding the examination and its findings.

92.    Coffey testified that during the polygraph examination, John Doe stated he never forced Jane Roe or anyone else to have sex with him.  Doe also stated that during his sexual encounter with Roe she never asked him to stop touching her.  Coffey testified before the University Judicial Council that the test used with Doe was the same test that is used by the U.S. Military.  When used, a score of + 5 is considered passing, and evidence that the person being tested is not lying.  It was Coffey's testimony before the panel that John Doe scored a + 12.  This score was more than twice that of what is required by the U.S. military to exemplify honesty.

93.    Jane Roe did not submit to a polygraph examination of any kind.

94.    At the November 16, 2017, hearing the female student who attended formal with John Doe testified.  She stated that during her first interview with Defendant Ussery, Ussery told

her not to inform Doe that she had been contacted and to "forget about" Doe and to "move on".

When they spoke in September 2017, Ussery informed the student that Jane Roe was a victim and

suggested supporting Doe would be considered retaliation and could get her in trouble. This

travesty was made even worse when the student questioned Ussery about her apparent bias, and

Ussery advised that Doe was not Ussery's responsibility and that she had no obligations to him.

95.     The University Judicial Council began deliberations around midnight on the night

of November 16, 2017.

96.     During the course of deliberations, Defendant Murry inappropriately met with the

Council for approximately one hour and interfaced with the deliberative process of the panel.

Subsequently, at 2:30 a.m. on November 17, 2017, the panel announced a finding of "Responsible"

and sanctioned Doe in the form of a suspension from November 16, 2017, through August 2018.

97.     The University Judicial Council offered no explanation for its finding or for the

sanction. The November 17, 2017, letter issued by the University did not provide any explanation

of the decision, nor discussion of the facts that were considered. The determination letter made no

mention of inculpatory or exculpatory evidence and provided no information regarding how the

sanction of suspension was determined.

98.     The determination made by the University Judicial Council was contrary to the

substantial evidence and was arbitrary and capricious, having no basis in the facts presented.

Furthermore, the University did not provide any basis for the sanctions issued against John Doe,

in violation of the Cleary Act and contrary to the most recent guidance of the U.S. Department of

Education, Office of Civil Rights.

99.     The November 17, 2017, determination and decision by the University's Judicial

Council was rendered without consideration of the absence of any threat by John Doe to commit

any future acts, the fact that the University's Title IX Coordinator had not deemed it necessary to issue a "no contact" letter to the Doe with regard to the Complainant pending the proceedings and the absence of any other complaints against Doe.  Furthermore, the decision did not consider the fact that aside from the singular allegation levied by Jane Roe, John Doe had never had any disciplinary issues and is a person of outstanding moral character.  Certain of these factors are specifically identified in the University 's relevant policy, DSA.SC.200.075 "Sexual Misconduct", as factors material or relevant to the determination of sanctions.

100.    On Thursday, November 30, 2017, John Doe appealed the University's decision.

101.    On Friday, December 1, 2017, the Appellate Consideration Board met to consider John Doe's appeal.  The following Monday, December 4, 2017, Doe was informed that his appeal was denied.

102.    On Tuesday, December 5, 2017, John Doe was provided notification that the University had decided to increase his sanction from a suspension to expulsion.  No discussion of the inculpatory or exculpatory evidence that was considered has ever been provided to Doe, nor has Doe been given any explanation or rationale for the increased sanctions.

103.    Throughout the course of the University's investigation, John Doe has been subjected to threats and ridicule.  Although the Defendants were aware of this, no action was taken.

**Title IX and The Department of Education**

104.    All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance must comply with Title IX.

105.    Upon information and belief, the implemented standards, criteria, and policies employed and guiding the University were exercised under the auspices of, and pursuant to the U.S. Department of Education's Office for Civil Rights April 4, 2011 "Dear Colleague Letter" on

student-on-student sexual harassment and sexual violence (also hereafter referred to as "Dear Colleague Letter"). (This Dear Colleague Letter is available at http://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html).

106.    The 2011 Dear Colleague Letter and the 2014 guidance required schools to adopt a minimal standard of proof when administering student discipline. The 2011 Letter discouraged cross-examination by the parties and suggested that to recognize a right to such cross examination might violate Title IX. Furthermore, the 2011 Letter limited any due process protections given to accused students as it directed that no unnecessary delay should exist when resolving charges.

107.    On September 7, 2017, Betsy DeVos, the U.S. Secretary of Education, announced that "Rule by [the 2011] Letter is over." In a public address she expressed concerns raised by members of academia that the approach pushed by the U.S. Department of Education for the previous several years exerted improper pressure on universities to adopt Title IX procedures that do not afford fundamental fairness to all students. Secretary DeVos advised that she thought the professors who raised these concerns were right and described the system as failed and one that imposed policy without even the most basic safeguards.

108.    In a September 22, 2017, Dear Colleague Letter, the U.S. Department of Education, Office of Civil Rights released a notice stating that while the 2011 and 2014 guidance documents may have been well intentioned, they have led to the deprivation of rights for many students and they have denied fair process to accused students. The Office of Civil Rights advised that the April 2011 Dear Colleague Letter's "improper pressure upon universities" resulted in universities developing procedures for resolving sexual misconduct complaints that lacked the "most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."

*See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf

109.    In September 2017 the Office of Civil Rights provided specific guidance for universities with respect to grievance procedures and investigations. It is this guidance that should have served as the standard for the investigation of matters involving John Doe and the determination by the University.

110.    The Defendants were aware of the announcement by the Secretary of Education Betsy DeVos and the Department of Education's new guidance. Despite this, the Defendants failed to exercise their authority to modify their unconstitutional policies or practices and/or rectify the erroneous determination and disproportionate sanctions issued to John Doe.

111.    On October 10, 2017, a formal statement was posted by the University expressly indicating the University had not made any policy or procedural changes related to Title IX cases.

**Actions of IHL, the University of Mississippi, State of Mississippi, and Defendants Murry and Ussery**

112.    John Doe was subjected to an inequitable grievance and appeal process. The determination and decision by the University's Judicial Council was not supported by substantial evidence, was arbitrary and capricious, unconstitutional, an abuse of discretion or otherwise not in accordance with law, beyond the power and legal authority of the University Judicial Council under a proper application of law and fact, and was discriminatory.

113.    The University's Student Conduct policy statement regarding the Adjudication Process indicates that all relevant information will be considered by the University Judicial Council. However, Defendant Ussery did not identify, preserve, or consider exculpatory evidence in her report.

114.    Due process imposes a duty on the State to disclose exculpatory material and favorable evidence to a defendant. U.S. Const. Amends. 14; *Manning v. State*, 884 So. 2d 717 (Miss. 2004); *Armstrong v. State*, 214 So. 2d 589 (Miss. 1968

115.    The University's Sexual Assault Response Guidance Resources for the Accused state that silence may be used as inference of responsibility at the conduct hearing. The University's policy "University Conduct Process" – DSA.SC.300.010, in Section 4(j) thereof, mandates and prescribes that "[r]refusal to respond to questions posed during a hearing may lead to an adverse inference by the hearing panel concerning the subject matter of the question posed, and this adverse inference, if applicable, may be one factor considered by the hearing panel in making its decision." The standard applied by the customs, policies and practices of the University inherently mandates an involuntary and compulsory waiver of the Plaintiff's constitutional rights inasmuch as silence by John Doe at his disciplinary hearing would equate to an adverse inference and a tacit admission of wrongdoing, without proper constitutionally-mandated safeguards. This deprivation is heightened in matters such as a sexual misconduct charge where the only witnesses are the complainant and the accused, and the determination of responsibility or guilt is determined based singularly upon credibility.

116.    John Doe was not allowed the opportunity to be heard·in a meaningful time and in a meaningful manner and likewise was deprived of fundamental substantive rights. In this regard, the University's Sexual Assault Response Guidance Resources for the Accused states that the accused student "is afforded due process and is not assumed to be responsible by the board. Rather, the conduct board weighs all evidence presented in the hearing and uses the 'preponderance of the evidence' standard to determine whether an individual is responsible for violating the university's sexual misconduct policy…". University of Mississippi policy

DSA.SC.200.075 provides that "[t]he standard of proof for all cases involving sexual misconduct will be based upon the University's established standard of preponderance of the evidence." The use of the "preponderance of the evidence" standard as the threshold legal standard for an adjudication of "Responsible" or guilty under the totality of the circumstances presented is illegal and unconstitutional and was/is arbitrary and capricious.

117.    While the purported guarantee provided by the University's "University Conduct Process" provides that "[a]s the parties present information for the panel's consideration, members of the hearing panel (including the chair), the respondent, and the complainant, when applicable, may ask questions of the parties and other witnesses concerning the information presented or other information pertinent to the charge" – in custom, policy and practice, a respondent is not allowed to actually ask questions himself.  This mechanism is the Respondent's sole means under University of Mississippi policies DSA.SC.200.075 and DSA.SC.300.010, as applied, and the University of Mississippi's Office of Conflict Resolution and Student Conduct's Title IX "Hearing Script," for a Respondent to cross-examine either the Complainant or any of the witnesses against him.

118.    Defendant Murry, Director of Conflict Resolution & Student Conduct, specifically advised John Doe, "…if [he had] questions for the complainant prepared, [he could] email them to [Murry]. All questions must be submitted and approved by the Chair person.

119.    During the University's hearing process, John Doe was not allowed to cross-examine Jane Roe or any other witness. Rather, Doe was required to submit any questions that he had to the Judicial Council for consideration.  At the first hearing, only one of the seventeen questions Doe submitted to the Council was asked of his accuser.  At the second hearing, not all of his questions were asked.

120. The University's policies and the University's Office of Conflict Resolution and Student Conduct's Title IX do not apply any rules of evidence and allow hearsay evidence and other inherently unreliable evidence of sexual misconduct, with the only stated criteria for direct or cross-examination questions being "relevance."

121. During each of the disciplinary hearings John Doe could not subpoena individuals to appear on his behalf.

122. The University's Sexual Misconduct / Student Conduct statement contained in University of Mississippi policy provides that before a proceeding, the complainant and respondent will both have the opportunity to see a list of board members who will serving as fact finders and may request recusal of any believed to be biased. This language necessarily implies that the parties will be able to see a list of board members significantly in advance of the hearing in order to actually have time to review the list and provide feedback to the University.

123. The selection of the second panel and failure to communicate the identity of the panel members until the final hours was contrary to the University's written policy and effectively denied John Doe adequate due process.

124. Defendant Ussery, the Title IX Coordinator, who conducted the investigation into this matter, exhibited considerable bias in the investigation, and her bias adversely impacted the investigation and hearing, as well as the finding of responsibility and the imposed sanction.

125. Defendant Ussery served as an investigator in this matter while simultaneously advising Jane Roe through the course of proceedings. The University of Mississippi policy "Sexual Misconduct" - DSA.SC.200.075 provides for and establishes the role of the Title IX Coordinator in overseeing policies and procedures that apply to sex discrimination (including sexual harassment, sexual assault, and sexual violence) by students. By the terms of

27

DSA.SC.200.075, the "Title IX Coordinator investigates sexual misconduct by students." Policy DSA.SC. 200.075 also allows the Title IX Coordinator to "... decide whether there is sufficient evidence of sexual misconduct such that the complaint needs to be forwarded to the Office of Conflict Resolution and Student Conduct for a hearing." University policy, custom and practice also allows the Title IX Coordinator herself to be a witness against the accused, allowing her to comment in her testimony on" ... inconsistencies found during the investigation and on the credibility of witnesses interviewed."

126.    In addition, as the University of Mississippi's Title IX Coordinator, Defendant Ussery is responsible for policy development and training with respect to Title IX matters at the University. The training on Sexual Misconduct, Relationship Violence and Stalking, given to University Judicial Council panel members exhibits bias in favor of a complainant. The training gives the impression that all touching, and penetration is forbidden or, at the very least, suspect and advises that the lack of protest or resistance does not constitute consent, nor does silence. Members of the University Judicial Council are trained to ignore a lack of resistance by the complainant, to ignore a lack of protest by the complainant and to ignore silence and participation by the complainant. Furthermore, the training specifically instructs that in certain circumstances when both parties are intoxicated, University findings are to be made for the complainant.

127.    University Judicial Council members are trained that complainants sometimes don't believe they are "victims" and that when complainants withhold exculpatory details or lie to an investigator or the hearing panel, those lies should simply be considered a side effect of an assault.

128.    The intermingled and inherently conflicting duties of Defendant Ussery as the University's Title IX Coordinator, adopted by policy and as applied to John Doe, violated Doe's

due process rights.  Defendant Ussery served in the multiple and inherently conflicting roles of advocating for the female Complainant, investigating the alleged events, being permitted to submit a report of findings to the panel, training and advising the University's Judicial Council, and assuring that the University and its policies were enforced and were compliant with Title IX. Doe's interest in preserving his educational status and reputation in the face of a serious sexual misconduct charge was compelling.  The risk of erroneous deprivation of this interest was exacerbated by Ussery's inherently conflicting roles.  These roles substantially and materially lessened the University Judicial Council's adjudicatory autonomy and compromised the integrity of the adjudicatory process.

129.    The training on Sexual Misconduct, Relationship Violence and Stalking, given to University Judicial Council panel members exhibited bias in favor of a Complainant.  These materials advised the panel members that "victims" sometimes withhold facts and lie about details, question if they've truly been victimized and "lie about anything that casts doubt on their account of the event." University Judicial Council members were trained to ignore a lack of resistance by Jane Roe, to ignore a lack of protest by Roe and to ignore silence and participation by Roe. Additionally, the University panel members have been trained that complainants sometimes don't even believe they are "victims" and when Complainants withhold exculpatory details or lie to an investigator or the hearing panel, those lies should simply be considered a side effect of an assault.

130.    Furthermore, the training provided to the University's Appellate Consideration Board does not instruct panel members upon the proper standard of proof. Instead of instructing members of the definition of "preponderance of the evidence" standard the University supposedly follows, training given to panel members instructs that they "just need to have *some* evidence to

justify the outcome" (emphasis added) and should only consider an appeal if there is overwhelming evidence in the other direction.

131.    The stereotyping and bias of the Defendants created a hostile environment and adverse setting for males accused of sexual misconduct. The pattern and practice of the University of subjecting male students such as John Doe to biased investigations and stereotyping results in unlawful discipline and denial of constitutional rights.

132.    The University's Judicial Council improperly uses the preponderance of the evidence' standard to determine whether an individual is responsible for violating the University's Sexual Misconduct policy. In addition, the training provided by the University sets forth an incorrect statement of the preponderance of the evidence standard.

133.    John Doe's "Responsible" or "Not-Responsible" status, in violation of law and constitutional guarantees, was determined by the testimony of witnesses who were not sworn or placed under oath and under circumstances whereby Doe was not allowed the issuance of compulsory process to compel the attendance of witnesses and/or the production of evidence, inclusive of exculpatory evidence.

134.    The University subjected John Doe to a proceeding devoid of virtually all due process and any constitutional safeguards and based solely upon a credibility determination. The determination was both excessive and unwarranted and represents a selective enforcement of the University's sanctions policy DSA.SC.300.020, as the by-product of gender bias against male students under allegations of sexual misconduct. The University did not provide Doe with even the limited protections and procedural rights set forth on the face of its own policies.

135.    The investigation of Doe and the multiple hearings he has been through have been riddled with bias, a failure by the University to abide by Department of Education guidelines and a conscious and deliberate disregard for Doe's Constitutional rights by each of the Defendants.

## COUNT 1
## VIOLATION OF TITLE IX

136.    John Doe hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 135 as if set forth fully herein.

137.    Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681, *et seq.* provides, in relevant part:

> No person in the United States shall on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

138.    Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681, *et seq.* applies to all public and private educational institutions, if any part of the school receives federal funds. The University receives such funds.

139.    "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *See Yusuf v. Vassar* College, 35 F.3d 709, 715 (2nd Cir. 1994).

140.    A state is not immune under the Eleventh Amendment of the Constitution of the United States from suit in federal court for a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et. seq.* or the provisions of any other federal statute which prohibits discrimination by recipients of federal financial assistance.

141.    42 U.S.C. § 2000 d-7 contains an express statutory abrogation of Eleventh Amendment immunity for Title IX suits.  This aggregation is a valid exercise of congress' power under the spending clause to impose unambiguous conditions on states receiving federal funds.

By enacting § 2000 d-7, Congress puts states on notice that accepting federal funds waived their Eleventh Amendment immunity to discrimination suits under Title IX. Furthermore, § 2000 d-7 is a valid exercise of Congress' power under § 5 of the Fourteenth Amendment. It is the position of the Department of Justice that § 2000 d-7 is an unambiguous abrogation which gives states express notice that a condition of receiving federal funds is the requirement that they consent to suit in federal court for alleged violations of Title IX and other statutes.

142.    In *Cannon v. The University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed. 560 (1979), the United States Supreme Court held that private individuals have an implied right of action under Title IX and that damages are available in such lawsuits. In addition, the U.S. Supreme Court has ruled that monetary damages are available in private Title IX actions involving intentional violations. *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Remedies for a violation of Title IX by a university include compensatory damages, injunctive relief and attorney's fees. *Id.*

143.    The United States Supreme Court has ruled that, "the award of individual relief to a private litigant who has prosecuted [his] own suit is not only sensible, but it is also fully consistent with and in some cases even necessary to the orderly enforcement of the [Title IX]. *See Cannon,* at 706-707.

144.    The University receives federal financial assistance and is subject to Title IX. The University's imposition of discipline where gender is a motivating factor in the investigation and/or decision to discipline is thus enforceable through a private right of action.

145.    The IHL and the University and the State had an obligation under Title IX to make sure that adequate training as to what constitutes sexual harassment and alleged sexual assaults was provided by the University.

146.    The Department of Education has recognized that the procedures adopted by a university covered by Title IX must afford due process to all parties involved.  The United States Supreme Court has found that the reason why due process matters is so that cases are not decided "on the basis of erroneous or distorted conceptions of the law or the facts".  *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980).

147.    Pursuant to Title IX of the Education Amendments of 1972, John Doe has a right to pursue his education free from discrimination by the University and the other Defendants on the basis of his sex.

148.    In violation of Title IX of the Education Amendments of 1972, John Doe has wrongfully subjected to a University disciplinary proceeding marked by procedural flaws, sex based biased, and selective enforcement.

149.    John Doe was subjected to an erroneous outcome by the Defendants with respect to the investigation and discipline issued against him in this matter, in violation of Title IX.  Doe was wrongly found to have committed sexual assault and gender bias was a motivating factor.

150.    The denial of due process and gender bias that existed throughout the investigation and enforcement of discipline against John Doe resulted in an erroneous outcome that was based on flawed and distorted facts and/or application by the Defendants.  The Defendants failed to conduct an adequate, reliable and impartial investigation.  The investigation was biased against Doe, based upon his gender, and deprived him of material information necessary to meaningfully participate in the investigation and adjudication process.

151.    Defendant Ussery and Defendant Murry limited John Doe's ability to have a fair and impartial hearing.  Ussery deliberately and recklessly and intentionally refused to accept evidence from Doe and misrepresented the statements of witnesses in her report.  Murry knew this

yet allowed an unmodified report to be presented to the University Judicial Council. Additionally, Murry intentionally interceded in the deliberations of the University Judicial Council. Furthermore, despite the knowledge that Jane Roe was permitted to reference the findings of an earlier proceeding which had already been held to be biased, Murry and the University allowed the proceedings to continue to conclusion and his ensuing appeal was denied.

152.    The Defendants did not weigh the evidence in John Doe's favor and excluded exculpatory evidence from their consideration. Furthermore, the sanction that was issued against Doe was arbitrarily imposed without any explanation or rationale by the University.

153.    The University Judicial Council and previous proceedings evince gender bias against the John Doe, as a male student, as part of a pattern of decision-making whereby the disciplinary procedures governing sexual assault claims are discriminatorily applied in favor of guilt on the part of the male students.

154.    Upon information and belief, male students in sexual misconduct cases at the University are discriminated against solely on the basis of their sex. Male students are typically found guilty regardless of the evidence and certain exculpatory evidence is excluded from consideration.

155.    The totality of the circumstances establishes that the Defendants acted out of a gender bias in reaching the erroneous outcome in this matter and have demonstrated a pattern of inherent and systemic gender bias and discrimination against male students who are accused of sexual misconduct at the University. Individuals who support the male students are targeted or ignored.

156.    The University's failure to consider exculpatory evidence or to detail the rationale for the results of the November 17, 2017, hearing establish the inequity of the proceedings, violate the Cleary Act and are contrary to the most recent guidance of the Department of Education.

157.    An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of the parties and witnesses, and synthesize all available evidence- including inculpatory and exculpatory evidence- and to consider the unique and complex circumstances of each case. *See September, 2017 Q&A, citing* 2001 Guidance at (V)(A)(1) -(2); *See also* 34 C.F.R.§668.46 (k)(2)(ii).  Absent review of exculpatory evidence, an investigation is inequitable.

158.    The University knew, or in the exercise of due care should have known, that at least one member of the University Judicial Council lacked training to carry out the responsibilities set forth in the disciplinary enforcement requirements of Title IX.

159.    As set forth in the Department of Education's September, 2017 Q & A on campus sexual misconduct, issued by the Office of Civil Rights, the Clearly Act requires that post-secondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding. The notification must include any initial, interim or final decision by the institution, any sanctions imposed by the institution and the rationale for the results and the sanctions. *See* 34 CFR § 668.46 (k)(3)(iv).  In addition, the September, 2017 Q & A on Campus Sexual Misconduct provides states that any rights or opportunities that a school makes available to one party during the investigation should also be made available through the other party on equal terms. *Citing 2001 Guidance* at (X).   A school may not restrict the ability of one party to discuss the investigation and restricting the ability of either party to do so through gag orders or similar directives is, in the eyes of the Office of Civil Rights, likely to deprive the parties of the

ability to obtain and present evidence or otherwise defend their interest and is likely to be considered inequitable.

160.    Contrary to the requirements of the Cleary Act and the Department of Education's guidance, the University's determination letter failed to include any discussion of the inculpatory or exculpatory evidence considered or any rationale for the sanction imposed.

161.    The University's policies and procedures, as implemented and carried out in practice and custom, fail to meet the standards required by Title IX regarding how universities conduct disciplinary proceedings and sanctions.

162.    In violation of Title IX of the Education Amendments of 1972, John Doe has been wrongfully subjected to sanctions by the University and State as a result of the biased and flawed disciplinary proceedings.

163.    Upon information and belief, the Defendants had knowledge that the policies of the University were in violation of Title IX, biased against male students accused of sexual assault and void of due process protections, yet deliberately failed to remedy the situation.

164.    IHL and the University knew or should have known that the actions and omissions of Murry and Ussery posed an unreasonable risk of the denial of due process and gender discrimination with regard to John Doe and other male students accused of sexual assault.

165.    The investigation and discipline of John Doe was discriminatory and based upon Doe's gender.

166.    As a direct and proximate result of these facts and omissions of the Defendants, John Doe has suffered and continues to suffer harm.  Doe is entitled to declaratory relief, an injunction enjoining violations of Title IX by the Defendants in the process of investigating and adjudicated sexual misconduct complaint, and full and immediate reinstatement at the University.

Doe is entitled to have any finding of responsibility wholly and permanently expunged from his academic record and to a seal of all such proceeding to protect against subsequent disclosure to any other person or academic institution. Additionally, Doe is entitled to damages in an amount to be determined at trial, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements.

167.    All damages available to John Doe pursuant to Title IX are also available as a consequence of the University's breach of contract with the University, and/or IHL and/or State.

## COUNT TWO

## VIOLATION OF THE 14TH AMENDMENT OF THE UNITED STATES CONSTITUTION, BROUGHT PURSUANT TO 42 U.S.C. § 1983

168.    John Doe hereby incorporates and adopts each and every allegation in the preceding paragraphs numbered 1 through 167 as if set forth fully herein.

169.    The Fourteenth Amendment of the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV, § 1.4

170.    Pursuant to the Fourteenth Amendment of the United States Constitution, John Doe, possesses a property interest in his status as a student at the University and his education, as well as a liberty interest in his reputation.

171.    The Defendants are state actors who owe John Doe protections consistent with the Fourteenth Amendment to the U.S. Constitution.

172.    Although due process is required in campus disciplinary cases, John Doe's due process rights were denied by the Defendants.

173.    At all times herein, the Defendants were acting under color of state law, and their actions and omissions caused John Doe to be subjected to a deprivation of his constitutional rights and suffer harm in violation of Title IX.

174.    The policies, practices and procedures of the University with respect to investigations and issuance of discipline towards the accused, both facially and as applied, violate federal law and are inconsistent with the Department of Education guidelines.

175.    The policies, practices and customs of the University which were adopted, implemented, maintained and sanctioned by the University and its policymaking official(s) were the moving force behind the deprivation of John Doe's constitutional rights and were adopted, maintained and applied with deliberate indifference to the rights of John Doe and other similarly situated male students.

176.    The Defendants' conduct violated John Doe's substantive and procedural due process rights by denying Doe fundamentally fair disciplinary procedures, the right to a meaningful opportunity to clear his name and by irreparably damaging his right to pursue his education and future career opportunities.

177.    After learning of the developments from the U.S. Department of Education, including redaction of former guidance and a statement by the Secretary of Education that previously endorsed procedures likely caused violations of students' constitutional rights, the Defendants deliberately took no steps to modify the policies, procedures or training within the Title IX office.

178.    While John Doe's initial appeal resulted in the Appellate Consideration Board finding Defendant Ussery had failed to consider exculpatory evidence or present such to the hearing panel, the Defendants did not take appropriate action to remedy the situation.

179.    Defendant Ussery knowingly, deliberately and intentionally refused to accept certain evidence presented by John Doe for consideration and refused to consider such evidence in a supplemental submission to the hearing Council.   In addition, when questioned about her potential bias Ussery informed a student that she had no obligations to Doe.

180.    Defendant Murry deliberately failed to address Ussery's discriminatory bias and intentionally and deliberately interfered with the deliberative process of the University Judicial Council so as to cause John Doe to suffer a denial of due process.

181.    Defendant Ussery and Defendant Murry knew or should have known of the requirements of Title IX and the substantive and procedural due process rights to which Plaintiff and others are entitled.  Despite this knowledge and the clearly established nature of both statutory and constitutional mandates, they acted with deliberate indifference towards those rights.

182.    As a direct and proximate result of the actions and omissions of the Defendants, John Doe has suffered and continues to suffer damages, including but not limited to, loss of educational opportunity, classroom time, loss of future income, liberty and property deprivations, humiliation, and mental anguish.  Doe seeks recovery from the Defendants jointly and severally for the damages suffered.  Doe is entitled to declaratory relief, an injunction enjoining violations of Title IX by the Defendants in the process of investigating and adjudicated sexual misconduct complaint, and to immediate full reinstatement in good standing at the University. Doe is entitled to have any finding of responsibility wholly and permanently expunged from his academic record and to a seal of all such proceeding to protect against subsequent disclosure to any other person or academic institution.  Additionally, Doe is entitled to compensatory and punitive damages in an amount to be determined at trial, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements.

183.    John Doe further seeks and is entitled to punitive damages as against the individual
Defendants as a result of their deliberate and intentional actions carried out with conscious
disregard for the constitutional injury.

## COUNT THREE

## BREACH OF CONTRACT

184.    Plaintiff hereby incorporates and adopts each and every allegation in the preceding
paragraphs numbered 1 - 183, as if set forth fully herein.

185.    John Doe paid the University's fees and tuition for his education, and in return the
University, IHL and State contracted to provide him with access to its undergraduate programs
and ultimately, upon further performance by Doe, to continued education and a degree and
diploma.  This relationship is contractual in nature.

186.    The University and/or IHL and/or State breached its contractual obligations to John
Doe by failing to abide by Title IX, subjecting Doe to a gender bias and failing to comply with its
own policy and procedures, and by the adoption and implementation of unconstitutional customs,
polices and practices in the implementation of Title IX at the University.

187.    John Doe is entitled to recover damages for the University's breach of contract.  As
a direct and proximate result of the University's conduct, Doe sustained damages including the
inability to attend classes, and continue pursuit of his education, harassment, threats, emotional
distress and economic damages including attorney's fees, for which recovery is sought pursuant
to 42 U.S.C. Section 1988 and otherwise.

188.    Alternatively, if the Court determines that an express contract between John Doe
and the University does not exist, after expiration of a 120-day waiting period following the service
of the University with a tort claims notice, Doe will assert a breach of implied contract claim

against the University, through an amended complaint. Doe is not presently asserting such a claim, and this paragraph is added for notice purposes only.

## PRAYER FOR RELIEF

Wherefore, Plaintiff John Doe respectfully **demands trial by jury** and requests the following relief:

A.      The Court enter a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the Defendants have violated Title IX and policies and practices of the University, both facially and as applied violate the due process rights of John Doe.

B.      The Court enter an Injunction enjoining Defendants from violating John Doe's constitutional rights and rights established under Title IX, by continuing the discriminatory and unlawful disciplinary action that was issued against him, requiring the University immediately to restore Doe as a student in good standing at the University and prohibiting further disciplinary proceedings against him pending resolution of this matter. Doe is entitled to have any finding of responsibility wholly and permanently expunged from his academic record and to a seal of all such proceeding to protect against subsequent disclosure to any other person or academic institution.

C.      Retain jurisdiction of this matter for the purpose of enforcing the Court's Order.

D.      Award John Doe monetary relief in an amount to be determined but in excess of the minimum jurisdictional limits of this Court.

E.      Award John Doe costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by Title IX and 42 U.S.C §1988.

F.      Grant such further and additional relief as the Court may deem just, proper, and equitable.

Respectfully submitted,

**JOHN DOE**

By: _____
J. Lawson Hester, His Attorneys

J. Lawson Hester (MS Bar No. 2394)
lhester@pbhfirm.com
Michelle T. High (MSB #100663)
mhigh@pbhfirm.com
Pettis, Barfield & Hester, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi 39211
P.O. Box 16089
Jackson, Mississippi 39236-6089
Telephone: 601-987-5300
Facsimile: 601-987-5353