**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOHN DOE**                                                                                          **PLAINTIFF**

**V.**                                                             **CIVIL ACTION NO. 3:18-cv-63-DPJ-FKB**

**THE UNIVERSITY OF MISSISSIPPI; STATE
INSTITUTIONS OF HIGHER LEARNING ("IHL");
TRACY MURRY, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; HONEY USSERY,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY;
STATE OF MISSISSIPPI, and DOES 1-5.**                            **DEFENDANTS**

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR RESPONSE
TO MOTION FOR PRELIMINARY INJUNCTION**

In May 2017, Jane Roe, a University of Mississippi student, lodged a formal complaint with Honey Ussery, the University's Title IX Coordinator, alleging Plaintiff John Doe had engaged in sexual intercourse with her without her consent. Under University policy, Ussery conducted an investigation and submitted a written report to the Student Conduct office. Her report did not contain findings, recommendations, or commentary on the credibility of the witnesses she interviewed. At two subsequent University Judicial Council hearings, Roe stated she told Plaintiff she did not consent to sex. Plaintiff stated, while Roe did not verbally consent to sex, he believed that her actions indicated her consent. In Plaintiff's words, Roe's complaint created a "he-said/she-said situation." The Judicial Council, the University's fact-finding body, found that Plaintiff violated the University's policy prohibiting sexual misconduct. The Appellate Consideration Board upheld that finding and imposed a sanction of expulsion. As a result, the University expelled Plainitff in December 2017.

In its Order on Defendants' Motion to Dismiss, this Court dismissed many of Plaintiff's claims. His remaining claims are based largely on his contention Ussery discriminated against him on the basis of his gender and/or deprived him of his procedural due process rights. Plaintiff must now substantiate the allegations contained in his pleadings to obtain injunctive relief. For the reasons below, he cannot do so.

## THE UNIVERSITY'S SEXUAL MISCONDUCT POLICY

The University has a disciplinary policy that prohibits various types of sexual misconduct, including nonconsensual penetration or touching, sexual harassment, sexual exploitation, stalking, use of drugs or alcohol to induce incapacity, and retaliation.[1] The policy provides that any person who believes he or she has experienced sexual misconduct by a student may submit a complaint to the Title IX Coordinator.[2] Plaintiff has not alleged the University lacks the authority to adopt such a policy.

The sexual misconduct policy specifically prohibits "[s]exual intercourse, or sexual penetration, however slight, with any object or body part without effective consent."[3] Plaintiff clearly disagrees with the import of the University's policy. For example, his preliminary injunction papers complain Judicial Council members are trained that lack of protest or resistance does not constitute consent and silence does not mean consent has been given.[4] However, that language is straight out of the University's sexual misconduct policy.[5] Plaintiff

---

[1] *See* Ex. "1" (Sexual Misconduct Policy), at 5-7.
[2] *Id*. at 1.
[3] *Id*. at 5.
[4] Pl.'s Brf., at 22 [Doc. 22].
[5] *See* Ex. "1" (Sexual Misconduct Policy), at 4.

has cited no authority making it unlawful for the University to define "effective consent" or to require its students to obtain it before engaging in sexual activity. The University has numerous other policies that regulate student conduct. The sexual misconduct policy does not differ in kind from those other policies except to the extent that Title IX *requires* the University to have certain safeguards in place to prevent sex discrimination and sexual harassment of all kinds. Neither the "stigma" associated with a finding of responsibility nor the fact some acts of sexual misconduct might also constitute criminal behavior justify heightened scrutiny of the University's sexual misconduct policy, as the same could be said for the University's policies forbidding assault and battery, theft, and arson.[6]

### Plaintiff is Not Entitled to a Preliminary Injunction

A preliminary injunction is an "extraordinary remedy never awarded as of right."[7] "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[8] A preliminary injunction should only be granted if the movant has "clearly carried the burden of persuasion on all four prerequisites."[9]

---

[6] *See* Policy: Assault and Battery, *available at* https://policies.olemiss.edu/ShowDetails.jsp?istatPara=1&policyObjidPara=11079475*;* Policy: Theft, *available at* https://policies.olemiss.edu/ShowDetails.jsp?istatPara=1&policyObjidPara=11079476; Policy: Arson, Explosives, and Emergency Equipment, *available at* https://policies.olemiss.edu/ShowDetails.jsp?istatPara=1&policyObjidPara=11079477.
[7] *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008).
[8] *Id*. at 20.
[9] *Thompson v. Attorney General of the State of Miss*., 129 F. Supp. 3d 430, 433 (S.D. Miss. 2015) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618, 621 (5th Cir. 1985))

1. *Plaintiff cannot clearly show he is likely to succeed on the merits.*

The Court previously granted in part Defendants' Motion to Dismiss, leaving only Plaintiff's Title IX claim and a portion of his procedural due process claim.[10] Plaintiff cannot clearly show he is likely to succeed on the merits of either.

a. *Plaintiff is unlikely to succeed on a Title IX claim.*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[11] A number of courts have allowed students to attack university student conduct proceedings under Title IX, but only the Second and Sixth Circuits appear to have adopted a specialized framework for such claims.[12] Here, Plaintiff proceeds under an erroneous outcome theory and a deliberate indifference theory.[13]

i. *Plaintiff is unlikely succeed under his erroneous outcome theory.*

Though not prescribed by the Fifth Circuit[14] or the United States Supreme Court,[15] other

---

(*cleaned up*).

[10] Order, p. 23 [Doc. 75].

[11] 20 U.S.C. §1681.

[12] *Yusuf v. Vassar Coll.*, 35 F. 3d 709, 715 (2d Cir. 1994); *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018); *Plummer*, 860 F.3d at 777 (noting that the Second Circuit has held a university may be liable for imposing discipline where gender is motivating factor under two general theories); *Plummer v. Univ. of Houston*, 2015 U.S. Dist. LEXIS 189229, *50 (S.D. Tex. May 28, 2015) (noting the lack of binding precedent for erroneous outcome theory).

[13] Order, p. 9 [Doc. 75].

[14] *Plummer v. Univ. of Houston*, 2015 U.S. Dist. LEXIS 189229, *50 (S.D. Tex. May 28, 2015) (aff'd *Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017); *Pacheco v. St. Mary's Univ.*, 2017 U.S. Dist. LEXIS 94510, *34 n. 8 (W.D. Tex. Jun. 20, 2017).

[15] *Doe v. Trustees of Boston Coll.*, 892 F.3d 67, 67 (1st Cir. 2018)

4

federal courts have required plaintiffs proceeding under an erroneous outcome theory to ultimately establish (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceedings, and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."[16] To demonstrate the required gender bias, the plaintiff may rely on "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decisions-making that also tend to show the influence of gender."[17]

To cast doubt on the accuracy of the proceedings, the plaintiff must ultimately show he or she "was innocent and wrongfully found to have committed an offense."[18] Plaintiff was found responsible of violating the University's sexual misconduct policy, which prohibits sexual intercourse without "*an affirmative agreement—through clear actions or words—to engage in sexual activity*."[19] The policy further states "[r]elying solely on non-verbal communication can lead to misunderstanding" and *"[p]ersons who want to engage in sexual activity are responsible for obtaining consent—it should never be assumed*."[20]

Plaintiff pled in his First Amended Complaint "Jane Roe had affirmatively stated that she

---

[16] *Yusuf*, 35 F.3d at 715; *cf Doe v. Trustees of Boston Coll.*, 892 F.3d 67, 67 (1st Cir. 2018) (noting that the First Circuit has not adopted a framework for disciplinary proceeding claims); *Doe v. Rider Univ.*, 2018 U.S. Dist. LEXIS 7592, *25 (D.N.J. Jan. 17, 2018) (noting the Third Circuit has not adopted a framework for disciplinary proceeding claims).

[17] *Yusuf*, 35 F.3d at 715.

[18] *Pacheco v. St. Mary's Univ.*, 2017 U.S. Dist. LEXIS 94510, *49 (W.D. Tex. June 20, 2017) (citing *Yusuf*, 35 F.3d at 715).

[19] Ex. "1" (Sexual Misconduct Policy), at 4.

[20] *Id*.

wanted to have sex on the evening of March 30, 2017,"[21] but he represented the opposite during his actual student conduct hearing. There, he conceded he did ***not*** receive a verbal "direct yes"[22] from Roe, and explained he thought the encounter was consensual because they "***never came to the conclusion that [they] didn't want to have sex***"[23] and "***came to the conclusion that [they] didn't say [they] didn't want to***."[24]

The absence of a consensus that both parties did not want to have sex, however, is not an affirmative agreement that both parties did want to have sex. The Judicial Council did not find he "force[d] Jane Roe to have sex with [him],"[25] that he had sex with Jane Roe after she "ask[ed] [him] to stop touching her,"[26] or that he had sex with her despite her being "too intoxicated to give conscious consent for sex."[27] Instead, consistent with Plaintiff's own account, the Judicial Council found that he had sex with Roe without obtaining her affirmative consent.[28] Accordingly, he cannot show that he "was innocent and wrongfully found to have committed an offense."

---

[21] First Am. Compl. p. 18 ¶ 70 [Doc. 25].

[22] Ex. "F" to Mtn. to Dismiss, 24:8-15, 70:9-11, 71:20-25, 130:16-131:2; 124:21-24 [Doc. 28-5] (Restricted Status).

[23] *Id*.

[24] *Id*.

[25] Pl's Brf., p. 11 [Doc. 12] (quoting Polygraph Examination of Plaintiff).

[26] *Id*.

[27] *Id*. Though not cited in his Motion for Preliminary Injunction, Plaintiff previously pled Ussery refused to consider exculpatory evidence revealing "no findings of any injury to her vagina or neck" and "no physical injury to Roe." Pl.'s First Am. Compl. [26] ¶ 89. Plaintiff was not found responsible for physically injuring Roe, but for failing to obtain her affirmative consent.

[28] *See Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1224 (D. Ore. 2016) ("The University correctly points out that the elements of sexual misconduct, as defined by the Student Conduct Code, are quite different than the elements that a state prosecutor would have to prove beyond a reasonable doubt in a criminal case.").

Plaintiff cannot show gender bias was a motivating factor behind the purportedly erroneous finding. To establish the required gender bias, Plaintiff must identify "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decisions-making that also tend to show the influence of gender."[29] Plaintiff has come forward with no such proof, relying instead on alleged deficiencies in the process Ussery used to compile her report. As many courts have recognized, allegations regarding mere deficiencies in the investigative or adjudicative process are insufficient to support a viable Title IX claim, as there is no natural link between a purported procedural error and gender bias.[30] Instead, a successful plaintiff must couple those procedural deficiencies with a specific showing regarding the actual influence of gender.

In *Doe v. Columbia University*, for instance, the plaintiff coupled his assertions regarding procedural inadequacies with a specific allegation that, during the plaintiff's administrative proceedings, there "was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of ***female* students**

---

[29] *Yusuf*, 35 F.3d at 715.

[30] *Yusuf*, 35 F.3d at 715 ("Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss . . . A plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."); *Mallory v. Ohio Univ.*, No. 01-4111, 76 Fed. App'x 634, 638 (6th Cir. Sept. 11, 2003); *Doe v. Univ. of Cincinnati*, 2018 U.S. Dist. LEXIS 51833, *14 (S.D. Ohio Mar. 28, 2018) ("Because Plaintiff has failed to show how the alleged procedural deficiencies are connected to gender bias, Plaintiff fails to state a claim under Title IX based on erroneous outcome theory."); *Doe v. Rider Univ.*, 2018 U.S. Dist. LEXIS 7592, *24 (D.N.J. Jan. 17, 2018) ("Courts have found that specific allegations of procedurally flawed proceedings coupled with conclusory allegations of gender discrimination are not sufficient to survive a motion to dismiss."); *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009) (holding allegations of inconsistency with Title IX and efforts to reach predetermined result insufficient to state erroneous outcome claim).

***alleging sexual assault by <u>male</u> students*** . . . [and] the President called a University-wide open

meeting with the Dean to discuss the issue."[31] Still other courts have been even more stringent,

requiring more than a showing of peripheral news accounts and investigations related to a

university's general handling of sexual misconduct cases before giving plausibility to a claim

that such outside pressures infected the university's process with gender bias.[32]

Additionally, "allegations of a bias against the alleged ***perpetrator*** in favor of the ***victim***

[are] insufficient to show an inference of gender bias."[33] This is so because "a bias against

people accused of sexual [misconduct] and in favor of victims . . . indicate[s] nothing about

gender discrimination."[34] Illustratively, in *Doe v. Rider University*, the court granted the

university's motion to dismiss because, while the plaintiff catalogued a number of alleged

procedural deficiencies and statements leaning in favor of a pro-victim bias, he was unable to

---

[31] *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016).

[32] *See*, e.g., *Doe v. Baum*, 227 F. Supp. 3d 784, 818 (E.D. Mich. 2017); *see also Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586 (finding sufficient allegation individual assigned to adjudicate plaintiff's student conduct hearing had previously expressed disbelief as to whether male student was aroused by female student's unwanted touching).

[33] *Doe v. Rider Univ.*, 2018 U.S. Dist. LEXIS 7592, *26 (D.N.J. Jan. 17, 2018); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 606-07 (S.D. Ohio 2016) ("at worst, UC's actions were biased in favor of alleged victims of sexual assault and against students accused of sexual assault.").

[34] *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996); *Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016) (finding alleged procedural deficiencies showing bias in favor of complainants "do[] not equate to gender bias because sexual-assault victims can be both male and female"); *see also Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 777 (N.D. Ind. 2017) ("Although these facts raise some question about the outcome of the disciplinary proceeding and a certain informality in the information-gathering process, these facts do not suggest that Plaintiff was treated differently because of his gender."); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."); *King v. DePauw Univ.*, 2014 U.S. Dist. LEXIS 117075, *28 (S.D. Ind. Aug. 22, 2014) ("the fact that a vast majority of those accused were found liable might suggest a bias against accused students, but says nothing about gender.").

8

make the necessary connection to gender discrimination.[35] The court specifically held that a dean's statement of "***I'm going against you***" did not refer to the plaintiff's sex or demonstrate a bias against the plaintiff because he was male.[36]

Here, there was no disparate treatment between Plaintiff and Roe, much less gender-based discrimination. Construing his assertions broadly, Plaintiff points to the following as evidence of disparate treatment:

1. Plaintiff asserts Ussery "served as an advocate for the female accuser, was a witness at Doe's first hearing, asserted ruling as to relevance of potentially exculpatory evidence submitted by Doe[,] and acted as a prosecutor during the course of the investigation";[37]

2. Plaintiff asserts he was "limited in his ability to communicate with others, while Jane Roe was openly discussing her allegations with others;"[38] and

3. Plaintiff asserts Ussery did not obtain and/or include certain evidence he wanted included in her report.[39]

Plaintiff's allegations reflect either a misunderstanding or obfuscation of Ussery's role in the Title IX complaint process. Ussery is indeed charged with investigating Title IX complaints and gathering relevant evidence regarding those claims.[40] Contrary to Plaintiff's claims, though, she does not act as an advocate for the complainant.[41] Likewise, she does not act as a prosecutor or judge because she does not argue for a particular outcome or make any final decisions. The

---

[35] *Doe v. Rider Univ.*, 2018 U.S. Dist. LEXIS at *28.
[36] *Id.*
[37] Pl.'s Brf. p. 20 [Doc. 12].
[38] Pl.'s Brf. p. 21 [Doc. 12].
[39] *Id.*
[40] *See* Ex. "2" (Ussery Declaration), at ¶¶ 2, 12.
[41] *Id.* at ¶ 7.

University's policies specifically provide that The Title IX Coordinator's report "will not contain findings of fact as to whether a violation of the sexual misconduct policy actually occurred."[42] A separate policy designates the Judicial Council as the "fact-finding and decision-making body" on campus.[43] Ussery's role in the disciplinary process is limited to investigating complaints, summarizing relevant information in a report, and determining whether sufficient evidence exists to send the report to the Student Conduct office for a hearing.[44] Sufficient evidence exists for a hearing if a factual issue must be resolved. In this case, Ussery sent the file for a hearing by the Judicial Council because she determined an issue of fact existed as to whether she gave effective consent to have sex with Plaintiff.[45] Ussery's report did not credit or discredit witness statements, nor did it reach a conclusion or offer a recommendation as to whether Plaintiff violated the policy.[46]

Despite Plaintiff's attempt to portray Ussery's exclusion of certain items as evidence of bias against him (or, more importantly, bias against him because he is a male), the truth is that Ussery treated Plaintiff and Roe exactly the same. Jane Roe also submitted information that she thought was relevant but which Ussery excluded from her report. For instance, Roe submitted pictures, text messages, and an email from Plaintiff regarding their first sexual encounter that Roe thought was probative, but which Ussery declined to include in her report.[47] Just as Plaintiff

---

[42] *See* Ex. "1" (Sexual Misconduct Policy), at 8.
[43] *See* Ex. "3" (Structure of the University Conduct System Policy), at 1.
[44] *See* Ex. "2" (Ussery Declaration), at ¶ 12.
[45] *Id.*
[46] *See* Ex. "B" to Mot. to Dismiss (Ussery Report) [Doc. 28-1] (Restricted Status).
[47] Ex. "2" (Ussery Declaration), at ¶ 15.

was allowed to submit additional evidence under a cover page marked "Respondent's Additional Information," Roe was allowed to submit those additional items under a cover page marked "Complainant's Additional Information."[48] Ussery did not decline to include Plaintiff's additional evidence because he is a male, but, regardless, that information was submitted to the factfinder.

Likewise, the purported "gag order" that, according to the pleadings, was imposed on Plaintiff but not Roe, fails to substantiate Plaintiff's claims of disparate treatment. First, the sworn affidavit submitted in support of his motion does not support his construction of the facts. Under oath, Plaintiff stated "I was under the impression that I was not supposed to discuss the investigation with anyone," rather than his much broader contention the he "had significant restrictions placed on his ability to communicate with witnesses and professors"[49] and "[t]his gag order impaired his ability to be able to fully review evidence to be used in the case or at the hearing and ample time to assess such evidence."[50] In other words, Plaintiff cannot actually testify that Ussery subjected him to a "gag order." In any event, Plaintiff has never identified any witness with whom he was unable to communicate, and actually called several witnesses to testify at his hearings.

Ussery informed both Plaintiff and Jane Roe that the University prohibited retaliation in connection with Title IX proceedings recommended they avoid any conduct that could be

---

[48] *Id*. at ¶ 15.
[49] Pl.'s Brf. p. 21 [Doc. 12]; Pl.'s Aff. ¶ 29 [Doc. 7-2].
[50] Pl.'s Brf. p. 21 [Doc. 12].

construed as an adverse action or intimidation.[51] Plaintiff was not submitted to any prohibition that was not also imposed on Roe, and there was no disparate treatment between the two.

Plaintiff's pleadings allege a laundry list of purported inaccuracies and deficiencies in Ussery's report.[52] None of the alleged deficiencies hold up under scrutiny, much less constitute evidence of gender bias:

- "The report submitted by Ussery did not advise of Jane Roe's statement that she initially did not believe she was raped but her friends told her to report the situation." This (paraphrased) statement is attributed to Jane Roe in a report prepared by a University Police Department officer on April 6, 2017. This UPD report was attached as an exhibit to Ussery's report.[53]

- "Ussery's report indicated that Jane Roe told Plaintiff his touches felt good, however, Doe had reported this was said by Roe not just once, but on multiple occasions." Both Ussery and Becki Bressler kept contemporaneous and detailed handwritten notes of the July 11, 2017 interview with Plaintiff (at which his attorney was present).[54] Both wrote Plaintiff reported Jane Roe "seemed to like it" when he touched her and that she told him "it feels so good."[55] Ussery's report states Plaintiff reported Roe "seemed to like it and said, 'it feels so good.'"[56] In other words, the report is both (1) consistent with the

---

[51] Ex. "2" (Ussery Declaration), at ¶ 10.
[52] Am. Compl., at ¶ 70 [Doc. 26].
[53] *See* Ussery Report, at 15 [Doc. 28-1] (Restricted Status).
[54] *See* Ex. "2" (Ussery Declaration), at ¶ 8, Ex. "E"; Ex. "4" (Bressler Declaration), Ex. "A".
[55] Bressler wrote that Plaintiff reported that Roe "seemed to *really* like it."
[56] *See* Ex. "B" to Mtn. to Dismiss (Ussery Report), at 9 [Doc. 28-1] (Restricted Status).

contemporaneous notes of two persons present and (2) not necessarily inconsistent with Plaintiff's alleged statement that Roe said the same thing more than once. In any event, it is not evidence of bias on Ussery's part.

- "Ussery's report erroneously stated that Plaintiff reported Jane Roe 'adjusted his pants.' However, Doe reported that Roe pulled down his pants, again evidencing her intent to proceed with consensual relations." Both Ussery and Bressler's contemporaneous notes reflect that Plaintiff specifically said Roe "adjusted his pants."[57] It is difficult to see how such a statement could constitute bias on Ussery's part, though, as her report states: "[Plaintiff] said that [Roe] adjusted his pants and pulled her underwear to the side and they had sex."[58] She clearly reported Plaintiff's meaning –he claimed Roe took some action with respect to his pants that facilitated sex.

- "Critically, Ussery's report failed to accurately reflect Plaintiff's statement that Jane Roe had affirmatively stated that she wanted to have sex on the evening of March 30, 2017." Neither Ussery nor Bressler's notes reflect that Plaintiff made any such statement, which is hardly surprising in light of the fact *he admitted under questioning at the November 2017 disciplinary hearing that "[t]here was no direct yes" to sexual intercourse by Jane Roe*.[59]

- "The report submitted by Defendant Ussery did not reference the fact that Jane Roe had asked an officer to delay contacting Plaintiff about her allegations until after a sorority

---

[57] *See* Exs. "2" (Ussery Declaration), at 8, Ex. "E"; "4" (Bressler Declaration), at Ex. "A".
[58] *See* Exs. "2" (Ussery Declaration), at 8, Ex. "E"; "4" (Bressler Declaration), at Ex. "A".
[59] *See* Transcript (Nov. 17, 2017), at 130:24-131:2 [Doc. 28-5] (Restricted Status) (emphasis added).

party because she thought that she would see Plaintiff at that party." This statement is in the April 6, 2017 UPD report, which was attached as an exhibit to Ussery's report.[60]

- "The report submitted by Defendant Ussery did not mention the fact that Jane Roe indicated on multiple occasions that she did not want to pursue charges against Plaintiff and that she executed a non-prosecution form." Ussery's report attached two UPD reports that indicated Roe was unsure of whether she wanted to press criminal charges, as well as a "non-prosecution form" she signed on April 20, 2017.[61]

- "The report submitted by Defendant Ussery did not address the fact that Jane Roe had told University Police in April, 2017, she felt that she had received the closure she needed." The UPD report recounting that statement was attached to Ussery's report.[62]

- "Defendant Ussery did not address the forensic police evidence obtained and maintained by the University of Mississippi police department in her report, including the physical evidence procured from Jane Roe." Ussery's report attached UPD documentation of evidence gathered from Roe and a completed sexual assault examination form completed by a medical professional.[63]

- "Defendant Ussery did not interview the dormitory administrator who knocked on Plaintiff's room and escorted Doe and Roe downstairs on the evening of March 30,

---

[60] *See* Ex. "B" to Mtn. to Dismiss (Ussery Report), at 16 [Doc. 28-1] (Restricted Status).
[61] *Id*. at 14, 18, 31.
[62] *Id*. at 26.
[63] *Id*. at 27-28; 34-45.

2017."  The Court has already held that information from this person would not have been exculpatory.[64]

- "Defendant Ussery did not interview the security personnel who was in the lobby of Plaintiff's dormitory on the evening of March 30, 2017, nor address his presence in her report." Again, even if Plaintiff was entitled to compel Ussery to interview this person, he cannot identify any reason he would have provided exculpatory information.

- "Upon information and belief, Defendant Ussery inaccurately paraphrased and summarized certain witness statements." Plaintiff has failed to identify any other inaccurate statements in Ussery's summary of witness statements, despite the fact that he and his attorney were allowed to review Ussery's interview notes before the second disciplinary hearing.[65] In any event, Defendants have already produced the balance of Ussery's handwritten notes.[66]

Plaintiff also alleges Ussery was biased against him because she did not amend her report to include additional photographs or to reflect the results of a forensic report or a polygraph report he sought to submit to her after the decision of the first Appellate Consideration Board. Ussery did tell Plaintiff and his attorneys that she would not include those materials in her report.[67] However, Plaintiff has cited no authority to suggest Ussery was required to modify her report (which had been completed and submitted three months earlier) to include every piece of

---

[64] *See* Order (July 24, 2018), at 16.
[65] *See* Ex. "2" (Ussery Declaration), at ¶ 22.
[66] *Id*. at Ex. "F."
[67] *Id*. at ¶ 21.

information Plaintiff submitted to her when Plaintiff was allowed to attach those documents and have the Judicial Council consider their relevance. Likewise, nothing suggests Ussery lacked the ability to determine, using her judgment, the relevance of the information she gathered from any source before including it in her report.

Substantively, Ussery was justified in refusing to amend her report to address those materials. Plaintiff provided no information to establish that the photographs were near in time to the incident on March 30, 2017, or that they had anything to do with it.[68]

Polygraph test results are inadmissible in Mississippi courts,[69] so it is unclear why Plaintiff thought he could force Ussery to include one in her report. Furthermore, the four questions asked by the polygraph examiner had nothing to do with the definition of "effective consent" under the University's sexual misconduct policy, which requires "affirmative agreement – through clear actions or words – to engage in sexual activity." Those questions were: "Did you force [Jane Roe] to have sex with you?"; "At any time during your sexual encounter did [Jane Roe] ever ask you to stop touching her?"; "Did [Jane Roe] appear to you to be too intoxicated to give conscious consent for sex?"; and "Have you ever forced anyone to have sex with you?"[70] Affirmative answers to these questions would not make it any more or less likely that Plaintiff violated the policy.

The author of the "forensic report" did not purport to examine Jane Roe, and his report

---

[68] *Id*. at ¶ 21. (emails w JD).
[69] *Carr v. State*, 655 So. 2d 824, 836 (Miss. 1995).
[70] *See* Ex. "5" (Respondent's Additional Information), at UM001601-001602.

did not mention her or the incident on March 30, 2017.[71] It focused on injuries that can be incurred during non-consensual sex, but it had no bearing on whether Plaintiff violated the policy because Jane Roe never alleged that she had been injured during the encounter.

Moreover, Plaintiff cannot dispute that those materials – along with many others he submitted – *were included in the case file that was provided to the Judicial Council members for his second hearing*.[72] This case file included a voluminous "Respondent's Additional Information" section that included numerous documents submitted by Plaintiff and his attorneys, regardless of relevance. Ussery had nothing to do with the preparation of that portion of the file.[73] After the second Judicial Council found Plaintiff responsible, he was allowed to submit a forty-eight page letter of appeal along with voluminous exhibits, the preparation and transmission of which Ussery also had no part in.[74]

Additionally, the authors of the two reports were witnesses before the Judicial Council at the second hearing. Ussery's report did not cast any doubt on the findings of Plaintiff's expert reports, and she could not have influenced the Judicial Council's view of them because she did not attend the second hearing or have any other contact with the Judicial Council members. Her refusal to include these materials is not evidence of gender bias.

Plaintiff also alleges that Ussery demonstrated bias when she met with another student who supported Plaintiff after the first Judicial Council hearing. Ussery requested to meet with the

---

[71] *Id*. at UM001627-001628.
[72] *Id*. (Respondent's Additional Information).
[73] *See* Ex. "2" (Ussery Declaration), at ¶ 21.
[74] *Id*. at ¶ 23; *see* Ex. "6" (Respondent's Appeal Information).

other student because she had received an informal complaint from Jane Roe that the other student had been engaged in potentially retaliatory activity.[75] The University's policy defines "retaliation" as "any adverse action (including intimidation) taken against an individual who has participated in any manner in an investigation, proceeding, or hearing under these policies and procedures." The purpose of the meeting was to explain the University's retaliation policy to the other student and to resolve Jane Roe's informal complaint of retaliation without proceeding with a formal retaliation complaint against the other student, both of which were within the scope of Ussery's responsibilities as Title IX Coordinator. Ussery advised the student not to engage in any behavior that could be perceived as retaliatory.

The student told Ussery that she was concerned for Plaintiff, and Ussery informed the student that Ussery could not do anything for Plaintiff because he had been expelled and was no longer a student at the University.[76] When the other student said that she thought Jane Roe had been inappropriately talking about Plaintiff's disciplinary proceedings, Ussery asked the student if she wanted to file a Title IX retaliation claim against Roe. The student declined. Nothing about this meeting suggests gender bias against Plaintiff.

Plaintiff also alleges that certain training materials for Judicial Council and Appellate Consideration Board members suggest the presence of gender bias on Ussery's part. This allegation lacks merit. The training slides attached to Plaintiff's Motion are not evidence of

---

[75] *Id*. at ¶¶ 19-20.

[76] While the first Appellate Consideration Board had already met at the time of Ussery's meeting with the other student, Ussery was not aware of that Board's decision, and she understood that Plaintiff was no longer enrolled as a student. *Id*. at ¶ 19.

gender bias. The slides do not constitute the entirety of the training that board members receive. Training topics are covered in much greater detail than the summary information on the slides, and trainees are given additional materials.[77] Plaintiff's specific complaints about the training slides are not evidence of gender bias on Ussery's part.

The "burden" discussed on page 30 of the presentation refers to the standard of review applied by the Appellate Consideration Board, not the standard applied by the Judicial Council at a live hearing. Pursuant to the University's policies, the Judicial Council applies a "preponderance of the evidence" standard. While there is no separate slide that explains the preponderance standard, that term is defined and explained in each training session.[78] The preponderance standard was also explained by the Judicial Council Chair at Plaintiff's hearing.[79]

All trainees are instructed that the respondent is presumed to be "not responsible" for violating the policy, as reflected on page 37 of the presentation.[80]

Trainees are instructed that a lack of protest, lack of resistance, or silence do not constitute consent to sexual activity, as reflected on page 10 of the presentation. As noted above, these statements are taken directly from the University's policy. Trainees are not taught to ignore any behavior allegedly exhibited by a complainant. Rather, they are trained that affirmative consent requires more than a showing the complainant did not protest or resist or a complainant

---

[77] *Id*. at ¶ 19-20.
[78] *Id*. at ¶ 24(a).
[79] Ex. "F" to Mot. to Dismiss, at 3:13-17 [Doc. 28-5] ("Furthermore, for today's proceeding the standard of proof is a preponderance of evidence, meaning the Council will be determining whether it is more likely than not that a violation has or has not occurred.") (Restricted Status).
[80] *See* Ex. "2" (Ussery Declaration), at ¶ 24(b).

remained silent during a sexual encounter.[81]

Although alcohol and drug use were not disputed issues in this investigation, trainees are told that complainants "sometimes withhold facts or lie regarding peripheral details like alcohol and drug use" as reflected on page 20 of the training slides. The training slides also advise trainees that complainants might leave out details or lie about anything that casts doubt on their version of events. These statements are consistent with Ussery's experiences with complainants. Trainees are not advised that "lies should be considered a side effect of an assault," that complainants should be believed over respondents, or that complainants are more credible than respondents. They are not taught to ignore any piece of evidence or to view it in any particular light. Rather, they are informed about behaviors commonly displayed by complainants.[82]

Trainees are not trained to ignore any piece of evidence or to give any piece of evidence undue weight. They are trained that there are many different types of information available, that they must evaluate the credibility of both parties and any other witnesses and that they should not jump to conclusions based on their own experiences or expectations.[83]

All training sessions also include a discussion of the impact of the proceeding on the respondent. Trainees are told that a respondent's emotional response at a Student Conduct hearing should not be considered evidence of their guilt. They are told that respondents may share details about the impact of an investigation and hearing process on their lives. They are also told that, like complainants, respondents may not have perfect recollection of the events

---

[81] *Id*. at 24(c).
[82] *Id*. at ¶ 24(e) and (f).
[83] *Id*. at ¶ 24(g).

surrounding the alleged incident.[84]

Ussery has never told any trainee that female complainants are more credible than male respondents, that they should presume that male respondents are responsible for a violation of the Sexual Misconduct policy, or that they should favor females over males in any way during their service on the Judicial Council or the Appellate Consideration Board.[85]

Also, Plaintiff has produced no evidence that any Judicial Council or Appellate Consideration Board member actually ignored some piece of evidence because of training they received, as was apparently the case in *Doe v. Brown University*.[86] In the other case Plaintiff cites about training materials, *Doe v. Univ. of Pennsylvania*, the plaintiff had alleged that "Defendant's training materials for university employees who are involved in disciplinary proceedings encourage the employees to believe the accuser and presume the accused's guilt."[87] In this case, the University's training materials specifically advise trainees that the respondent is presumed not responsible for a violation.[88]

Plaintiff has presented no evidence that Ussery or any other University employee or agent harbored or acted upon gender bias in the course of the investigation of Jane Roe's complaint or his disciplinary hearings and appeals.

---

[84] *Id*. at ¶ 24(h).
[85] *Id*. at ¶ 24(i).
[86] In that case, the Court heard live testimony from a panel member who testified that, because of training she received, it was "beyond her degree of expertise" to judge the complainant's behavior." 210 F. Supp. 3d 310, 342 (D.R.I. 2016). Even then, that Court stopped short of finding that the plaintiff's contractual rights had been violated for that reason. *Id*.
[87] 270 F. Supp. 3d 799, 823 (E.D. Penn. 2017).
[88] Ex. "2" (Ussery Declaration), at ¶ ¶24(b).

### ii.   *Plaintiff cannot succeed under his deliberate indifference theory.*

Under the deliberate indifference theory, a plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct."[89] However, as emphasized by the Sixth Circuit in *Doe v. Miami University*, even in the context of a student disciplinary process, the plaintiff must plead (and ultimately show) "that the misconduct alleged is ***sexual harassment***."[90]

In that case, the plaintiff attempted to support his deliberate indifference claim with allegations of "gender discrimination he asserts occurred throughout the disciplinary process" and the university's indifference to his contention regarding "sexual misconduct Jane perpetrated against him."[91] The Sixth Circuit found his claims regarding gender discrimination in the disciplinary process legally insufficient because they were "not tethered to a claim of sexual harassment."[92] The court further held Plaintiff's complaint regarding Roe's conduct on the night in question failed because a single incident did not "rise to the level of 'sexual harassment that is so severe, pervasive, and objectively offensive that it could be said to deprive the student of access to the education opportunities or benefits provided by the school.'"[93] Such a claim instead requires "an extensive pattern of sexually offensive behavior."[94] The Sixth Circuit therefore affirmed the dismissal of the plaintiff's deliberate indifference claim.[95]

---

[89] *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018).
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*

Here, Plaintiff similarly attempts to hinge his deliberate indifference claim on alleged gender discrimination he suffered during the student conduct process, and, although less than clear, potentially Jane Roe's conduct on the night in issue. In support of Plaintiff's deliberate indifference claim, he highlights the following:

1. "Furthermore, the actions and omissions of the ***Defendants*** show a deliberate indifference to Doe's Title IX rights."[96]

2. "Although John Doe was the victim in this case, the University did not allow him to review evidence which was believed to be exculpatory nor did the University consider exculpatory evidence that was put before it."[97]

3. "When Jane Roe made statements to the hearing panel that related to the finding of the first tainted hearing . . . [t]he Defendants had the authority to issue discipline against Jane Roe . . . [but] elected not to do so."[98]

4. "Despite clear evidence that Jane Roe was the instigator and had solicited sex from John Doe on the night in question, the University ignored such evidence in its entirety."[99]

None of the conduct alleged by Plaintiff constitutes sexual harassment sufficient to support a deliberate indifference claim under Title IX. As held by the Sixth Circuit, Plaintiff's claims regarding gender discrimination in the student conduct process are legally insufficient because they do not involve sexual harassment.[100] Likewise, Plaintiff's colorable claims regarding Roe's isolated conduct on the night in question cannot be construed as an "extensive

---

[96] Pl.'s Brf. p. 19 [Doc. 12].
[97] Pl.'s Brf. p. 22 [Doc. 12].
[98] *Id*.
[99] Pl.'s Brf. p. 21 [Doc. 12].
[100] In *Plummer*, the Fifth Circuit seemed to intimate that a plaintiff might be able under extraordinary circumstances to proceed on a deliberate indifference to constitutional rights theory. *See Plummer*, 860 F. 3d at 778 ("Deliberate indifference to constitutional rights is a very high standard of misconduct."). Plaintiff has pressed no such claim here, and the conduct described would fall short regardless.

pattern of sexually offensive behavior." Moreover, while Plaintiff refers to himself as the "victim in this case," he has never alleged he did not consent to the sexual encounter or he lacked capacity to consent to the event. Plaintiff cannot succeed on his deliberate indifference claim.

### b.  Plaintiff is unlikely to succeed on his procedural due process claim.

As consistently held by the Fifth Circuit, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion."[101] Instead, the court's determination is limited to whether the school employed fundamentally fair procedures to determine whether misconduct occurred.[102] While Plaintiff may disagree with the University's ultimate finding here, the procedures used to determine whether such misconduct occurred were fundamentally fair.

### i.  Plaintiff was provided notice and an opportunity to be heard.

Albeit an inherently flexible standard, the Fifth Circuit has held "due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct."[103]  In determining the amount of process due, the court should consider: a) the student's interest that will be affected, b) the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional safeguards, and c) the university's interests, including the burden that additional procedures would entail.[104]

Notably, in *Plummer v. University of Houston*, the Fifth Circuit found constitutionally

---

[101] *Plummer v. Univ. of Houston*, 860 F.3d 767, 772 (5th Cir. 2017) (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975)).
[102] *Id.* (quoting *Flaim v. Med. Coll. of Ohio*, 483 F.3d 629, 634 (6th Cir. 2005)).
[103] *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961).
[104] Order p. 14 [Doc. 75] (quoting *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976)).

sufficient a student conduct process that afforded accused students substantially less process than present here.[105] In that case, which featured a markedly different administrative process, the Title IX coordinator actually advocated for the complainant, investigated the events, prosecuted the respondent, testified as a witness at the hearings, trained the disciplinary hearing panel, and advised the disciplinary hearing panel.[106] Significantly, the Title IX coordinator resolved fact disputes and issued a determination as to whether the student had violated university policy.[107] While his determination was subject to review, the question on appeal was whether, by a preponderance of the evidence standard, "the results of *his investigation* should be sustained."[108]

The court nonetheless found the respondent students "received multiple, meaningful opportunities to challenge the University's allegations, evidence, and findings."[109] It further held the Title IX coordinator's dual roles did not amount to a constitutional violation, because the respondent students failed to show how alleged impermissible conflicts undermined the integrity of their proceedings. The court emphasized "[w]here allegations of bias based on the prejudgment of the facts or outcome of a dispute generally stem from the fact that an administrative body or hearing officer has dual roles of investigating and adjudicating disputes and complaints . . . the honesty and integrity of those serving as adjudicators is presumed."[110]

---

[105] *Plummer*, 860 F.3d at 778.
[106] *Id*. at 780 (Jones, J. dissenting).
[107] *Id*.
[108] *Id*.
[109] *Id*. at 774.
[110] *Id*. at 776 (*quoting Baran v. Port of Beaumont Nav. Dist. of Jeff. Cnty*., 57 F.3d 436, 446 (5th Cir. 1995)).

In dissent, Judge Edith Jones opined additional process was owed to the students.[111] But even Judge Jones' dissent does not go as far as Plaintiff would have it here. The *Matthews* balancing test in that case was completely different because, as she explained, the risk of erroneous deprivation was exacerbated by 1) complainant's failure to participate or provide evidence in the disciplinary proceeding, 2) the Title IX coordinator's role as the complainant's advocate while he also served as prosecutor, a witness, and legal adviser to the hearing panel, 3) the preponderance standard used by the Title IX coordinator in his fact-finding, along with the deference he claimed from the hearing panel, and 4) the imbalance between the level of counsel participation allowed on each side.[112]

Given those factors, Judge Jones posited additional process, such as eliminating the Title IX coordinator's role in advising and directing the hearing panel, elevating the standard of proof, and permitting counsel to represent the respondent students, would have further reduced the risk of erroneous deprivation.[113]

Here, the peculiar concerns of *Plummer* are notably absent. As previously stated, Ussery was not charged with carrying out multiple conflicting roles in the process. She gathered relevant

---

[111] *Id*. at 780.

[112] *Id*. at 782.

[113] *Id*. at 783. Judge Jones also criticized the court's reliance on two of its cited Sixth Circuit cases, because no criminal charges were pursued against the *Plummer* respondents, and the Sixth Circuit had found an investigator's alleged biases cured when the remainder of the proceedings were submitted to a review committee. ***In this case, any alleged bias in Ussery's report was cleansed by submission of the facts to a three-member initial panel and subsequent appeal to a three-member appellate board, and, contrary to the respondents in Plummer, Plaintiff was criminally indicted and remains facing criminal prosecution.***

facts for inclusion in her summary report, but she did not weigh the evidence, determine the truth of the matter, or determine whether Plaintiff violated University policy. Ussery did not even appear at the second hearing, and at the first, she read only a summary of the allegations without presenting a conclusion either way. She did not advise Jane Roe throughout the process, nor did she give counsel to the administrative board charged with resolving the facts and determining whether Plaintiff was responsible for violating University policy. Plaintiff was represented by multiple attorneys throughout the process, and both the complainant and respondent were allowed to have advisers during the hearing.

Accordingly, while the present proceeding may have turned on testimonial evidence rather than photo and video evidence, the University's process was far more rigorous than that provided to the respondent students in *Plummer*. And, as previously discussed, Plaintiff's own statement regarding the sexual encounter supported a finding that he violated the University's affirmative consent policy.  Plaintiff received adequate procedural due process.

### ii.  The University's standard of proof is constitutionally adequate.

As noted by the Court in its Order on Defendants' Motion to Dismiss, Judge Jones also opined that elevating the standard of proof for sexual misconduct disciplinary proceedings at universities might be required because sexual misconduct findings are quasi criminal and have long-lasting impacts on the accused.[114] While Judge Jones cited several law review articles in support of her proposal, it appears that every federal court to have considered the issue has found

---

[114] Order p. 21 [Doc. 75] (citing *Plummer*, 860 F.3d at 783 (Jones, J. dissenting)).

the preponderance of the evidence standard constitutionally adequate.[115] Outside the criminal

context, the Supreme Court has mandated a standard of proof higher than a preponderance of

evidence only in the most significant cases, such as civil commitments, termination of parental

rights, and denaturalization.[116] Moreover, contrary to the dichotomy specifically drawn for

sexual misconduct cases, universities routinely consider other types of student conduct

proceedings that involve factual conduct that is quasi criminal in nature or might have a long-

lasting impact on the accused.[117] Rather than developing a separate standard, courts have

generally recognized that the standard of proof applied in sexual misconduct proceedings should

be the same as applied in other student misconduct matters.[118]

---

[115] *Id*. ("Commentators have noted that applying the civil preponderance standard to quasi criminal charges seriously weakens due process for accused students."); *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016); *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 607 (D. Mass. 2016); *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1227 (D. Ore. Sept. 8, 2016) ("the standard of proof required for a University investigation and suspension based on its code of conduct is entirely different from the DA's standard to prosecute a criminal case."); *Pierre v. Univ. of Dayton*, 2017 U.S. Dist. LEXIS 44442, *23 (S.D. Ohio, Mar. 27, 2017) (noting that plaintiff's allegation that the preponderance of the evidence standard required him to shoulder the burden of proof was "incorrect and otherwise insufficient to state a claim"); *cf Doe v. Univ. of Colo*., 255 F. Supp. 3d 1064, 1082 n. 13 (D. Col. 2017) (noting that there is a "fair question" regarding the preponderance standard but citing no case law in support).

[116] *Santosky v. Kramer*, 455 U.S. 745, 757 (1982); *see also Lavine v. Milne*, 424 U.S. 577, 585 (1976) ("Outside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment.").

[117] *See*, e.g., *Goss v. Lopez*, 419 U.S. 565, 575 (1975) (noting that even in the context of other disciplinary matters, "[i]f sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment."); *Anderson v. Southwest Tex. St. Univ*., 73 F. App'x 775, 776 (5th Cir. 2003) (considering student conduct policy for illegal drug use or possession); *Bartram v. Pennsbury Sch. Dist*., 1999 U.S. Dist. LEXIS 7916, *6 (E.D. Penn. May 24, 1999) (considering conduct violation for use and possession of drugs); *S.G. v. Sayreville Bd. of Educ*., 333 F.3d 417, 425 (3rd Cir. 2003) (considering student conduct policy for threats of violence).

[118] *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("The selection of a lower standard . . . is not problematic, standing alone; that standard is commonly used in civil proceedings, even to decide matters of great importance. Here, however, the lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove . . .").

Here, the University's preponderance of the evidence standard passes constitutional muster. First, the University applied a preponderance of the evidence standard to all student conduct cases, regardless of whether allegations of sexual misconduct are at issue.[119] Under *Matthews*, the amount of process owed is case specific. Judge Jones' criticism of the University of Houston's standard of proof is inapposite here, where the University of Mississippi gave Plaintiff far more process by 1) separating the roles of the Title IX coordinator, the advisor for the complainant, and the advisor for the judicial council, 2) by submitting the facts to a three-member panel for initial determination, and 3) allowed both the complainant and respondent to have advisers present at the hearing. The University's use of a preponderance of the evidence standard is constitutional.

### 2.   *Plaintiff cannot clearly show that an injunction is in the public interest.*

In support of his request, Plaintiff claims the requested injunction will "not have an adverse effect on the public interest."[120] However, the question is not whether the granting of an injunction will have an *adverse effect* on the public interest, but whether the granting of the injunction is *in the public interest*.[121] In the context of student conduct proceedings, the courts have recognized compelling public interests on both sides of the equation.[122] In *Doe v. George Washington University*, the court acknowledged the public interest in the fair treatment of students in university disciplinary processes, but also recognized the important public interest in

---

[119] *See* Ex. "7" (Academic Conduct and Discipline Policy), at 6.
[120] Pl.'s Brf. p. 34 [Doc. 12].
[121] *See Winter*, 555 U.S. at 20 (*citing Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)); *see also Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 418 (S.D. Miss. 2013).
[122] *Doe v. George Washington Univ.*, 305 F. Supp. 3d 126, 131 (D.D.C. 2018).

universities "being able to independently investigate and, when appropriate, discipline, [their] students for misconduct."[123] Accordingly, the court held neither interest outweighed the other, and the public interest factor failed to support entry of a preliminary injunction.[124]

Here, the University has the same interest in investigating and disciplining its students for misconduct. That interest is necessarily enhanced where, as here, the allegations of misconduct relate not only to the accused student, but another student who complained that Plaintiff's conduct adversely affected her enrollment at the University. Plaintiff cannot show that the public interest clearly weighs in favor of granting his requested preliminary injunction.

### 3. *Plaintiff cannot clearly show the balance of equities tilts in his favor.*

Plaintiff claims the University's only interest "is a perceived threat to Jane Roe" and Jane Roe never requested that "John Doe not be allowed on campus."[125] Plaintiff is incorrect on both counts. The court has recognized that an injunction barring a university from investigating allegations of student misconduct "would cast doubt on [the university's] power to regulate its student body, including investigating and disciplining its students for sexual misconduct," and that such an injunction could therefore "cause harm to others."[126] Moreover, "[a] college's or university's interest in maintaining a hostile-free learning environment, particularly as it relates to its Title IX funding, is well recognized."[127]

Here, the University has a strong interest in enforcing its misconduct policy against a

---

[123] *Id.*
[124] *Id.*
[125] Pl.'s Brf. pp. 33-34.
[126] *Doe v. Ohio St. Univ.*, 136 F. Supp. 3d 854, 871 (S.D. Ohio 2016).
[127] *See Bonnell v. Lorenzo*, 241 F.3d 800, 822 (6th Cir. 2001).

student who was found to have violated the University's affirmative consent policy after being allowed a full hearing and appeal process, and against whom criminal charges remain pending. Additionally, contrary to Plaintiff's preferred version of the facts, Roe requested on multiple occasions that Plaintiff not be allowed on campus.[128] Plaintiff cannot clearly show that the balance of equities tilts in his favor.

### 4.    *Plaintiff cannot clearly show he is likely to suffer irreparable harm absent preliminary relief.*

The deprivation of a constitutional right may constitute irreparable harm, but the "argument that he is entitled a presumption of irreparable harm based on the alleged constitutional violation is without merit" if the court finds it unlikely the plaintiff will succeed on the merits of a constitutional claim.[129] As previously discussed, Plaintiff received adequate procedural due process, and his remaining claims of irreparable harm are insufficient.

Plaintiff claims that his expulsion will result in irreparable harm because "[t]here is no amount of monetary damages that are sufficient compensation for Plaintiff's inability to pursue his education" and "[e]ach day that passes results in further harm to Plaintiff's future education and career prospects."[130] Courts have found, however, that a delay in education can readily be remedied through monetary damages.[131] Additionally, a student's claim for irreparable harm is weakened by the student's own delay in seeking injunctive relief.[132] Illustratively, in *Montague*

---

[128] *See* Ex. "8" (Complainant emails).
[129] *Overstreet v. Lexington-Fayette Urban Cty.*, 305 F.3d 566, 578 (6th Cir. 2002).
[130] Pl.'s Brf. p. 32 [Doc. 12].
[131] *Montague v. Yale Univ.*, 2017 U.S. Dist. LEXIS 216093, *7 (D. Conn. Mar. 8, 2017).
[132] *Id*.

*v. Yale University*, the court found that if the student ultimately prevailed on his underlying claims, he would have "suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation."[133] The court further noted that if the student "believed he was facing irreparable harm from his expulsion," he should have filed his motion earlier rather than waiting "over four months" from the initiation of suit to seek relief.[134]

Plaintiff will similarly be given the opportunity to ultimately show whether he was unlawfully expelled from the University and allowed additional procedures if necessary. If he ultimately obtains reinstatement, he will have suffered a delay in his education "analogous to a suspension," which could be cured with money damages.[135] Furthermore, Plaintiff was expelled from the University on December 5, 2017, waited until January 26, 2018 to file his first complaint, waited until March 9, 2018 to file the instant Motion, and did not serve the first defendant until March 19, 2018.[136] Plaintiff cannot show he will suffer irreparable harm absent an injunction, and his own delay in pursuing such extraordinary relief undermines his request. Plaintiff cannot clearly show he is likely to suffer irreparable harm.

5.    ***Plaintiff requests inappropriate injunctive relief.***

Even if the Court determines Plaintiff is entitled to preliminary injunctive relief, which it should not, Plaintiff requests relief that the Court lacks authority to grant. Specifically, Plaintiff

---

[133] *Id.*

[134] *Id.*

[135] Monetary damages are unavailable for Plaintiff's constitutional claims, but he is also proceeding under a Title IX theory of liability. Defendants assert that money damages under Title IX are barred by Mississippi's sovereign immunity, but the Court found that issue non-determinative in ruling on Defendants' Motion to Dismiss.

[136] Compl. p. 22 ¶ 102, Compl. [Doc. 7], Mtn. for Prel. Inj. [Doc. 7], Summons Ret. [Doc. 16].

asks the Court to enjoin Defendants from "continuing the discriminatory and unlawful

discriminatory and unlawful disciplinary action that was issued against him, requiring the

University to immediately restore him as a student in good standing at the University and

preventing the University from enforcing either the finding of 'Responsible' and the sanction of

expulsion or any record of same on his academic record or transcripts, allowing him to enroll and

attend summer courses with the University, and to have unrestricted on-campus access to his

classes and non-residential University buildings, and prohibiting further disciplinary proceedings

against him pending resolution of this matter."[137]

It is not this Court's role to determine what happened on the night of March 30, 2017

between Plaintiff and Jane Roe, nor is it this Court's role to determine whether John

Plaintiff did or did not violate the University's affirmative consent policy.[138] Instead, the only

questions before this Court are whether the University discriminated against Plaintiff because he

is a male, and whether the University employed sufficient procedural due process in determining

he violated the University's affirmative consent policy.

The appropriate remedy for a deprivation of procedural due process is not an award of

Plaintiff's preferred outcome from the federal judiciary; instead, it is more process.[139] After all,

---

[137] Pl.'s Brf. p. 35 [Doc. 12].

[138] *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 312 (D.R.I. 2016) (noting even in the context of a private school breach of contract claim, "It is not the Court's role to determine the facts of what happened between John and Ann; to decide whether the Court would have, in the panel's position, found John responsible for sexual misconduct; to evaluate whether the Court would have made the same judgment calls on evidence and other issues as Brown did; or to determine whether the procedure John received was optimal.").

[139] *See Lee v. Macon Co. Bd. of Educ.*, 490 F.2d 458, 461 (5th Cir. 1974) (instructing the district court to "remand the case to the defendant Board for reconsideration under correct legal standards").

"procedural due process does not guarantee a particular result."[140] Courts have found that an award of a particular finding in the context of a Title IX proceeding is particularly inappropriate because the complainant has "certain rights in the processing of [the] sexual misconduct charge and [the] appeal" and universities "have substantial interests in investigating any student accused of committing sexual misconduct and sanctioning any student found responsible for such misconduct."[141] Accordingly, should the Court determine Plaintiff is likely to succeed on his claims, its injunctive relief should be narrowly tailored to providing Plaintiff any specific additional process the Court determines he was owed.

CONCLUSION

For the reasons stated above, the Court should deny Plaintiff John Doe's Motion for Preliminary Injunction.

---

[140] *Schindler v. Schiavo*, 403 F.3d 1289, 1295 (11th Cir. 2005).
[141] *Doe v. Alger*, 2017 U.S. Dist. LEXIS 62233, *12 (W.D. Va. Apr. 25, 2017) ("But vindication to Doe, in terms of a final finding of 'not responsible,' is not this court's to give.").

THIS, the 3rd day of August, 2018.

Respectfully submitted,

STATE OF MISSISSIPPI; THE UNIVERSITY OF MISSISSIPPI; STATE INSTITUTIONS OF HIGHER LEARNING; THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; C.D. SMITH, JR.; SHANE HOOPER; TOM DUFF; DR. FORD DYE; ANN H. LAMAR; DR. ALFRED E. MCNAIR, JR.; CHIP MORGAN; HAL PARKER; ALAN W. PERRY; CHRISTY PICKERING; DR. DOUG ROUSE; DR. J. WALT STARR; GLENN F. BOYCE; JEFFREY S. VITTER

*/s/ Paul B. Watkins, Jr.*
J. CAL MAYO, JR. (MB NO. 8492)
PAUL B. WATKINS, JR. (MB NO. 102348)
J. ANDREW MAULDIN (MB NO. 104227)
ATTORNEYS FOR DEFENDANTS

OF COUNSEL:
MAYO MALLETTE PLLC
5 University Office Park
2094 Old Taylor Road
Post Office Box 1456
Oxford, Mississippi 38655
Tel: (662) 236-0055
cmayo@mayomallette.com
pwatkins@mayomallette.com
dmauldin@mayomallette.com

35

**CERTIFICATE OF SERVICE**

I, Paul B. Watkins, Jr., one of the attorneys for the Defendants, do certify that I have electronically filed this document in the ECF system with the Clerk of the Court which sent notification of the filing to all attorneys of record.

THIS, the 3rd day of August, 2018.

 /s/ Paul B. Watkins, Jr.